ORIGINAL

JENNIFER LEE TAYLOR (BAR NO. 161368)
COLETTE R. VERKUIL (BAR NO. 263630)
WHITNEY MCCOLLUM (BAR NO. 253039)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94301
Telephone: 415-268-7000
Facsimile:  415-268-7522

Attorneys for Plaintiff
UBIQUITI NETWORKS, INC.

E-filing

FILED
MAY 1 8 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UBIQUITI NETWORKS, INC., a Delaware
corporation,

                    Plaintiff,

          vs.

KOZUMI USA CORP., a Florida corporation;
SHAO WEI HSU; LILIA KUNG; DOES ONE
THROUGH ONE HUNDRED.

                    Defendants.

Case No. CV 12—2582

Judge ___

DECLARATION OF BENJAMIN
MOORE IN SUPPORT OF
PLAINTIFF'S EX PARTE
APPLICATION FOR TEMPORARY
RESTRAINING ORDER

B. MOORE DECLARATION

1    I, Benjamin Moore, state and declare:

2        1.    I am the Vice President of Business Development at Plaintiff Ubiquiti Networks,

3    Inc. ("Ubiquiti") and make this declaration in support of Ubiquiti's application for temporary

4    restraining order.  I have personal knowledge of the matters stated herein, except where stated

5    based on information and belief, and if called upon to do so, I would testify competently to them.

6                              **Ubiquiti's Background**

7        2.    Ubiquiti was founded by Robert Pera in 2003 as Pera Networks, Inc.  In 2005, the

8    company's name was changed to Ubiquiti Networks, Inc.  Ubiquiti is a next-generation wireless

9    communications technology company that designs and develops proprietary technologies.

10   Ubiquiti's products and solutions have bridged the digital divide between emerging and

11   developed markets by fundamentally changing the economics of deploying high performance

12   networking solutions in underserved and underpenetrated markets globally.

13       3.    Ubiquiti sold its first wireless product in 2005—a high performance 802.11 mini

14   PCI Radio module called the SR2.

15       4.    Ubiquiti's wireless modules grew in popularity in areas where internet access was

16   not available or speeds and performance were insufficient.  We initially sold modules to

17   distributors in the United States who exported them internationally.  Soon, Ubiquiti was selling

18   modules to distributors worldwide, including distributors in Argentina, Brazil, Europe, and India.

19       5.    Ubiquiti received significant attention in August 2007 when a group of Italian

20   amateur radio operators set a distance world record for point-to-point links in the 5.8 GHz

21   spectrum using Ubiquiti cards and antennas.

22       6.    Before long, we realized that the best way to grow the business and create

23   defensibility would be for us to offer our customers complete solutions—complete radio with

24   antenna and enclosure.  That way, a customer only needed to buy Ubiquiti's all-in-one product

25   rather than piecing a kit together.

26       7.    In early 2008, Ubiquiti released the NanoStation2 and NanoStation5, complete

27   systems products with built in antenna that can provide a customer with wireless internet access

28   up to 10 miles away from the access point.  The integrated nature of the NanoStation product

B. MOORE DECLARATION                          2

1   makes it easy for integrators to set up and manage their system while Ubiquiti's business model

2   keeps the price of the product very competitive and accessible to the market.

3        8.    Ubiquiti's products quickly grew in popularity and companies from around the

4   world contacted Ubiquiti to become distributors of Ubiquiti products. Ubiquiti received the

5   Wireless Internet Service Providers Association ("WISPA") Manufacturer of the Year award in

6   both 2010 and 2011. Ubiquiti has also been nominated for awards by fellow wireless companies

7   at WISPAPALOOZA 2010 and has won awards for best manufacturer as well as product of the

8   year.

9        9.    Ubiquiti currently offers over 30 products to the global Wireless Internet Service

10   Provider ("WISP") market in the United States and in over 65 other countries.

11        10.    Ubiquiti and its associated products are well known in the wireless

12   communications space in the United States and worldwide. Consumers and competitors alike

13   throughout the world have come to recognize Ubiquiti's trademarks, including UBIQUITI™,

14   AIRMAX®, AIROS®, NANOSTATION™, and AIRGRID® and the Ubiquiti logo, as symbols

15   of Ubiquiti's excellence in wireless communications products. Ubiquiti invested hundreds of

16   thousands of dollars and research and development hours in the development of the AirMAX®

17   technology. That significant investment has resulted in an industry of grass-root WISPs using the

18   AirMAX® technology around the globe.

19        11.    Ubiquiti has taken systematic steps to protect its corporate name and product

20   names.

21        12.    On April 30, 2009, Ubiquiti filed a trademark application in the United States

22   Patent and Trademark Office ("USPTO") for the mark AIROS® (stylized) for computer software

23   in International Class 9, claiming a first use date of at least as early as January 29, 2008. This

24   trademark was registered on February 9, 2010 under Registration No. 3,746,223. Attached hereto

25   as Exhibit A is a true and correct copy of Registration No. 3,746,223.

26        13.    On December 23, 2009, Ubiquiti filed a trademark application in the USPTO for

27   the mark AIRMAX® for telecommunications and data networking hardware, also in International

28   Class 9, claiming a first use date of at least as early as July 1, 2009. This trademark was

B. MOORE DECLARATION               3

1 registered on August 24, 2010 under Registration No. 3,837,240.  Attached hereto as Exhibit B is

2 a true and correct copy of Registration No. 3,837,240.

3    14.  On January 7, 2010, Ubiquiti filed a trademark application in the USPTO for the

4 mark UBNT® for telecommunications and data networking hardware, also in International Class

5 9, claiming a first use date of at least as early as March 23, 2001.  This trademark was registered

6 on October 5, 2010 under Registration No. 3,856,016.  Attached hereto as Exhibit C is a true and

7 correct copy of Registration No. 3,856,016.

8    15.  On March 16, 2010, Ubiquiti filed a trademark application in the USPTO for the

9 mark AIRGRID® for antennas, also in International Class 9, claiming a first use date of at least

10 as early as December 1, 2009.  This trademark was registered on December 7, 2010 under

11 Registration No. 3,888,037.  Attached hereto as Exhibit D is a true and correct copy of

12 Registration No. 3,888,037.

13    16.  On April 30, 2009, Ubiquiti filed a trademark application in the USPTO for the

14 mark AIRCONTROL® for computer software, also in International Class 9, claiming a first use

15 date of at least as early as October 8, 2009.  This trademark was registered on August 3, 2010

16 under Registration No. 3,829,292.  Attached hereto as Exhibit E is a true and correct copy of

17 Registration No. 3,829,292.

18    17.  On April 30, 2009, Ubiquiti filed a trademark application in the USPTO for the

19 mark AIRVIEW® for wave generators, analyzers, and sensors, also in International Class 9,

20 claiming a first use date of at least as early as February 25, 2009.  This trademark was registered

21 on November 24, 2009 under Registration No. 3,715,098.  Attached hereto as Exhibit F is a true

22 and correct copy of Registration No. 3,715,098.

23    18.  On August 4, 2010, Ubiquiti filed a trademark application in the USPTO for the

24 mark UNIFI® (stylized) for transmitters and receivers, also in International Class 9, claiming a

25 first use date of at least as early as January 15, 2011.  This trademark was registered on

26 December 6, 2011 under Registration No. 4,068,223.  Attached hereto as Exhibit G is a true and

27 correct copy of Registration No. 4,068,223.

28

B. MOORE DECLARATION       4

19.    Ubiquiti also owns has pending applications for the following marks filed with the USPTO:

| Trademark | Goods/Services |
|---|---|
| AIRBLAST | Computer software |
| AIRCAM | Cameras; camera system; surveillance system; computer hardware for IP video surveillance |
| AIRFIBER | Broadband radios |
| AIRMAXSYNC | Computer hardware and software for setting up and configuring wide area networks |
| AIRSELECT | Computer software |
| AIRVISION | Computer software and hardware for use in network management |
| BULLET 2 UBIQUITI NETWORKS & Logo | Outdoor radio devices |
| Ubiquiti Logo | Broadband wireless equipment; computer software; wireless access point (WAP) devices; devices for wireless radio transmission; telecommunications and data networking hardware, antennae |
| EDGEMAX | Routers |
| INNERSTATION | Radio devices |
| MFI | Display monitors, auto compasses, and software to manage traffic |
| NANOBRIDGE | Telecommunications and data networking hardware, |
| NANOSTATION | Telecommunications and data networking hardware |
| PICOSTATION | Telecommunications and data networking hardware |
| POWERBRIDGE | Telecommunications and data networking hardware |
| ROCKET | Radio devices |
| UBIQUITI | Broadband wireless equipment; computer software; wireless access point (WAP) devices; devices for wireless radio transmission; telecommunications and data networking hardware, antennae |
| UBIQUITI NETWORKS | Broadband wireless equipment; computer software; wireless access point (WAP) devices; devices for wireless radio transmission; telecommunications and data networking hardware, antennae |
| UBIQUITI NETWORKS & Logo | Broadband wireless equipment; computer software; wireless access point (WAP) devices; devices for wireless radio transmission; telecommunications and data networking hardware, antennae |
| UNITEL | Computer software |

Attached hereto as Exhibit H are true and correct copies of the applications for registration of the above marks.

20.    Internationally, Ubiquiti holds registrations or has pending applications for all of the above marks in Argentina, Brazil, Chile, Colombia, Ecuador, Hong Kong, Paraguay, Peru, Taiwan, Uruguay, and Venezuela.  In addition, Ubiquiti has applied to register and has registered several of its brand names and products names in China and holds a European Union registration for UBIQUITI NETWORKS and Design.

21.    In addition to its trademarks, Ubiquiti owns two copyright registrations for its airOS® operating system:

       (a)    Ubiquiti owns U.S. Copyright No. TXu001795146 for airOS version 5.2.1.

       (b)    Ubiquiti owns U.S. Copyright No. TXu001795147 for airOS version 5.3.

### Industry Overview

22.    Wired networking solutions have traditionally been used to address increasing consumer and enterprise bandwidth needs. However, the high capital and operating costs associated with building and installing infrastructure for wired networks has severely limited the widespread deployment of wired networks in underserved and underpenetrated areas of developed countries and emerging markets. As a result, wireless networks are emerging as an attractive alternative for addressing the broadband access needs of underserved and underpenetrated markets.

23.    Existing wireless networking technologies such as 802.11 standard based Wi-Fi, WiMAX and LTE have been designed to satisfy the increasing demand for broadband access and support mobility, but often fail to meet the price-performance requirements of wireless networking in emerging markets, which in turn has led to large populations of underserved users in these areas.

24.    In the absence of affordable broadband access in the licensed spectrum, the number of users of the RF spectrum, which has yet to be formally licensed, has increased for communications equipment. As a result of high demand for the unlicensed RF spectrum, use of this spectrum to provide high quality wireless networking has become more challenging and congestion is limiting the growth of wireless networks.

25.    To provide robust wireless networks that meet the price-performance needs of individuals and businesses in underserved and underpenetrated markets, vendors of wireless networking solutions must solve some of the problems facing existing solutions:

- Poor performance. Existing wireless networking solutions built for the licensed RF spectrum are designed to operate in more predictable

environments and are not optimized for the crowded and less reliable unlicensed spectrum.

- High cost of ownership. Existing alternative solutions, such as fiber-to-the-premises, cable, DSL, WiMAX, LTE, and traditional backhaul, provide high capacity, high performance broadband access, but often do not meet the demanding price-performance requirements of underserved and underpenetrated markets.

- Complexity. Existing alternative solutions are often difficult to deploy and manage in heterogeneous network environments and require skilled employees or consultants to install and operate.

- Lack of reliability, resiliency and scalability. Existing wireless solutions are not designed to overcome obstacles and effectively recover from the dynamic changes in wireless spectrum usage that prevail in the unlicensed RF spectrum. Additionally, the performance and reliability of existing wireless networking solutions decline rapidly as the number of subscribers and range of service delivery increases.

### Ubiquiti's Products

26.    Ubiquiti is a product-driven company that leverages innovative proprietary technologies to deliver wireless networking solutions with compelling price-performance characteristics to both start-up and established network operators and service providers.

27.    Ubiquiti's products bridge the digital divide making high performance wireless networking solutions available to underserved and underpenetrated markets around the world. These markets include emerging markets and other areas where individual users and small and medium-sized enterprises do not have access to the benefits of carrier class broadband networking.

28.    Ubiquiti's business model has enabled us to break down traditional barriers such as high product and network deployment costs and achieve rapid adoption of our products and

B. MOORE DECLARATION                    7

solutions in previously underserved and underpenetrated markets throughout the world. Our business model and proprietary technologies provide us with a significant competitive advantage.

29.     Ubiquiti offers a broad and expanding portfolio of wireless networking products and solutions including products in the enterprise wireless local area network, or WLAN, and video surveillance markets. Our products and solutions, based on our proprietary technologies, include high performance radios, antennas, and management tools that have been designed to deliver carrier class performance for wireless networking and other applications in the unlicensed radio frequency, or RF, spectrum.

30.     Ubiquiti's products are easy to install, maintain, and manage, enabling both start-up and established network operators and service providers to deploy fast, scalable and reliable wireless networks cost effectively. Our wireless networking solutions offer the following key benefits:

- High performance wireless technologies for the unlicensed RF spectrum. Our proprietary products and solutions include high performance radios, antennas, and management tools that have been designed to deliver carrier class wireless broadband access and other services primarily in the unlicensed RF spectrum. Our products and solutions overcome significant performance challenges such as dynamic spectrum noise, device interference, outdoor obstacles, and unpredictable levels of video, voice, and data performance.

- Unparalleled cost effectiveness. Our products and solutions have been designed to enable service providers and network operators to deliver carrier class performance to their subscribers within the economic constraints of underserved and underpenetrated markets. The deployment and operation of our solutions require a fraction of the capital expenditures and network maintenance costs of those associated with existing alternative solutions.

B. MOORE DECLARATION                                    8

1    • <u>Integrated and easy to deploy and manage.</u> Our integrated products and

2    solutions eliminate significant complexity associated with the installation,

3    management and expansion of wireless networks. The level of integration

4    between our products is designed to enable network operators and service

5    providers to use a plug and play approach to delivering wireless broadband

6    access and other services that have carrier class performance without

7    significant management or upgrade complexity.

8    • <u>Reliable and scalable.</u> The reliability and predictability of our products and

9    solutions enable network operators and service providers to deliver to their

10    subscribers carrier class broadband connectivity in the unlicensed RF

11    spectrum. The combination of our key proprietary technologies enables us

12    to deliver reliable network performance that scales efficiently with an

13    increase in the number of subscribers, range of service delivery, network

14    size, and number of applications for video, voice, and data.

15    31.    Ubiquiti's product line includes the following:

16    • **NanoStation, NanoStation M, NanoStation Loco M** (collectively,

17    "NanoStation Products"): wireless customer premises equipment that

18    permit outdoor throughput.

19    • **NanoBridge**: a wireless bridge device used to connect two or more

20    network segments.

21    • **AirRouter**: indoor commercial wireless router.

22    • **Lite Station Series**: a long-range embedded hi-power Wi-Fi development

23    platform.

24    • **PicoStation**: The smallest outdoor access point in the world with up to

25    1000 mega Watts of output power.

26    • **PowerStation**: a versatile 802.11-based outdoor wireless platform. The

27    PowerStation can be used as an access point, a bridge, a point to multipoint

28    ("PMP") station, and mesh networking client, among other things.

B. MOORE DECLARATION                              9

- **AirGrid M series**: a broadband wireless device that combines antenna and radio using Ubiquiti's proprietary Innerfeed technology.
- **AirView series**: a spectrum analyzer to determine how crowded a wireless spectrum is.
- **Rocket M series**: radio devices with enhanced receivers.
- **UniFi series**: a WiFi system with a virtual management controller.
- **Bullet**: radio device with enhanced receivers.

32.    All Ubiquiti products run on Ubiquiti's proprietary airOS® operating system and under Ubiquiti's proprietary AirMAX® protocol. The AirMAX® logo is present on the packaging of all Ubiquiti products. The airOS® logo appears onscreen when the user logs in on the web interface using the Ubiquiti username and password, which also appear on the product packaging.

### Ubiquiti's Business Model

33.    Ubiquiti's business model is driven by a large, growing, and engaged community of network operators, service providers, and distributors, which we refer to as the Ubiquiti Community. The Ubiquiti Community has enabled us to redefine the traditional models for product development, sales and marketing, and product support in the following ways:

- Product development. Our products and solutions benefit from the active engagement between the Ubiquiti Community and engineers throughout the product development cycle, which eliminates long and expensive multistep internal processes and results in rapid introduction and adoption of optimally designed products. This approach significantly reduces our development costs and the time to market for our products.
- Sales and marketing. Rather than using a direct sales force, Ubiquiti relies on the Ubiquiti Community to garner awareness and demand for products.
- Product support. The members of the Ubiquiti Community have enabled Ubiquiti to foster a large, cost-efficient, highly scalable, and self-sustaining mechanism for rapid product support and dissemination of information.

B. MOORE DECLARATION                                         10

34.     The savings Ubiquiti achieves by relying on the Ubiquiti Community in the areas of product development, sales and marketing, and product support are passed along to network operators and service providers in the form of prices that are a fraction of those of existing alternative solutions.

**Ubiquiti's Product Distribution**

35.     An integral part of the Ubiquiti Community is the Ubiquiti Distributors. Distributors have a contractual relationship with Ubiquiti to distribute products in specified regions throughout the world.  Distributors provide Ubiquiti products to local resellers in those specified regions and the resellers sell Ubiquiti products to end users.

36.     To qualify as a Distributor, a company must order a minimum amount per quarter of Ubiquiti products (minimums depend on the distribution area) and sign a Distribution Agreement with Ubiquiti.  Distributors are listed on the Ubiquiti website under the "Distributors & Master Resellers" heading.

37.     Ubiquiti does not currently have a direct sales force, but instead relies on the Ubiquiti Community, including the Ubiquiti Distributors, to drive market awareness and demand for Ubiquiti products.  This community-propagated viral marketing enables us to reach underserved and underpenetrated markets far more efficiently and cost effectively than is possible through traditional sales models.

**Ubiquiti's Relationship with Kozumi and Defendant Hsu**

38.     On April 29, 2008, Defendant William Wu Hsu sent an email to sales@ubnt.com with the subject line "INQUIRY FOR Ubituity [sic] distribution."  A true and correct copy of that email is attached hereto as Exhibit I.  The email was sent from the email address william@kozumi-usa.com and signed "William Wu."  Mr. Hsu introduced himself as the "largest CPE [Customer Provided Equipment] provider of South America" and asked if Ubiquiti was interested in giving Hsu's company "the distribution of [Ubiquiti's] new products" for the Latin American market.  (*Id.*)

39.     I responded to Mr. Hsu that same day to inquire into the type of products Mr. Hsu's company then offered and the type and volume of Ubiquiti products he was interested

in. Mr. Hsu responded the same day, stating that he was the sole distributor for Edimax's EW-7209 APG product and sold "30K Access Points per month and 50K network cards per month for the WISP [Wireless Internet Service Provider] market in South America." (*Id.*) Mr. Hsu expressed an interest in distributing Ubiquiti's NanoStation2 and NanoStation5 products and requested an order of 5000 NanoStation2 and 1000 NanoStation5 products. (*Id.*)

40.    After some additional email exchanges with Mr. Hsu, where I confirmed that his company could adequately market Ubiquiti's products and would place consistent product orders, I decided that Mr. Hsu could be a Ubiquiti distributor for Latin America. On May 15, 2008, I sent Mr. Hsu a Distribution Agreement for his signature. I informed Mr. Hsu that his company would be listed on the Ubiquiti website as a distributor for Ubiquiti products in Brazil. A true and correct copy of that email is attached as Exhibit J.

41.    Mr. Hsu signed the Distribution Agreement on behalf of Kozumi and returned it on May 16, 2008. A true and correct copy of that email is attached hereto as Exhibit K. I signed the Distribution Agreement on the same day on behalf of Ubiquiti. A true and correct copy of the signed Distribution Agreement is attached hereto as Exhibit L.

42.    Under the Distribution Agreement, Ubiquiti appointed Kozumi to be a nonexclusive distributor of Ubiquiti products in Latin America. Ubiquiti's obligations under the contract were to provide product, sales, and technical training to Kozumi's sales team, to provide the agreed-upon pricing schedule, and to use reasonable efforts to deliver products in a timely fashion. Kozumi's obligations as a distributor were to use its best efforts to promote and market Ubiquiti products locally in Latin America and to use reasonable efforts to meet specified quarterly purchases. Kozumi also agreed not to disclose or release any Ubiquiti confidential information to any third party without Ubiquiti's approval. (*Id.*)

43.    The Distribution Agreement also made it clear that Ubiquiti owns all rights in its own trademarks. Section 3(b) of the Distribution Agreement provided as follows:

> Distributor is authorized to use Ubiquiti Networks name and trademark through its sales and marketing initiative – The ownership of such mentioned name and trademark will remain Ubiquiti Networks property.

B. MOORE DECLARATION                    12

1    (*Id.*)

2        44.    After becoming a distributor, Kozumi began purchasing Ubiquiti-branded products

3    from Ubiquiti at wholesale prices and promoting and selling those products in Kozumi's Latin

4    American distribution channels, specifically Argentina and Paraguay. Attached hereto as Exhibit

5    M is a true and correct copy of Ubiquiti's first invoice to Kozumi, dated September 18, 2008, for

6    $239,000.00.

7        45.    On June 7, 2009, Mr. Hsu notified us that Kozumi had changed its shipping

8    address to Kozumi's corporate address in Miami. Attached hereto as Exhibit N is a true and

9    correct copy of that email. Mr. Hsu requested that Ubiquiti ship all future products to Kozumi's

10   Miami address.

11       46.    On June 13, 2009, Mr. Hsu contacted me asking to be a Master Distributor of

12   Ubiquiti products. Attached hereto as Exhibit O is a true and correct copy of that email. Mr. Hsu

13   expressed a belief that he could meet the minimum Master Distributor quota of $2,000,000 per

14   year and asked about financing for large orders. I responded that Ubiquiti could list Kozumi as a

15   Master Distributor for Latin America, provided that Ubiquiti products were properly displayed on

16   Kozumi's website and it was clear from the website that Kozumi was distributing Ubiquiti

17   products. I also replied that Ubiquiti could provide 50/50 financing, with Kozumi putting 50%

18   down on orders and paying the remaining 50% after 30 days. (*Id.*)

19       47.    On September 10, 2009, Mr. Hsu expressed concern about the $250,000 credit

20   limit that Ubiquiti imposes on its distributors. In exchange for a larger credit limit, Mr. Hsu

21   offered to put up "7 houses in Miami (all houses are 100% owned without mortgage)" as

22   collateral. Attached hereto as Exhibit P is a true and correct copy of that email.

23       48.    In mid-September 2009, I visited the Kozumi website and discovered that Kozumi

24   was offering copycat products under its own brand that competed with Ubiquiti products. The

25   packaging and graphics of the advertised Kozumi brand products were very similar to the

26   Ubiquiti products Kozumi was also selling. Based on Kozumi's sales of its own products in

27   direct competition with Ubiquiti products, I terminated the distributorship between Kozumi and

28   Ubiquiti. I called Mr. Hsu on the phone and told him that Ubiquiti would no longer list Kozumi

B. MOORE DECLARATION                                    13

1    as a Ubiquiti Distributor and that Ubiquiti would no longer fulfill Kozumi's product orders. I was

2    concerned that if we did not terminate relationship, Hsu would be able to use the strength of the

3    Ubiquiti brand to draw resellers to its product offerings, only to sell them Kozumi-branded

4    products.

5         49.    On or around February 12, 2010, I received on email from Pushker Tiwari, a

6    distributor of Ubiquiti products in India. Attached hereto as Exhibit Q is a true and correct copy

7    of that email. Mr. Tiwari forwarded me an email he had received from Girijesh Mishra, the

8    National Sales Manager of GO.IP Global Services that advertised a Kozumi product called

9    Kozumi Air Force One 2 (AFO2). The advertisement showed Kozumi-branded packaging and

10   graphics that appeared very similar to those of Ubiquiti's products and advertisements.

11        50.    During his time as a Ubiquiti distributor, Mr. Hsu placed 12 orders with Ubiquiti,

12   which amounted to a total of $1,487,891.50 in products. Attached as Exhibit R is a true and

13   correct copy of all of the invoices sent from Ubiquiti to Kozumi. The last invoice sent to Mr. Hsu

14   at Kozumi was dated August 25, 2009 for $167,500.00. (*Id.*)

15        51.    After Ubiquiti ended its relationship with Mr. Hsu, Mr. Hsu began trying to get

16   Ubiquiti products through other Ubiquiti distributors.

17        52.    On March 13, 2010, Mr. Asim Sajwani of X-Concepts, a Ubiquiti Distributor in

18   Asia, blind carbon copied me on his response to an email from Mr. Hsu. A true and correct copy

19   of that email is attached hereto as Exhibit S. Mr. Hsu contacted Mr. Sajwani on March 9, 2010

20   asking to purchase Ubiquiti products—NanoStation M5 and NanoStation Loco M5—from Mr.

21   Sajwani. Mr. Hsu confirmed on March 11, 2010 that he wanted the Ubiquiti products shipped to

22   Paraguay. Mr. Sajwani responded to Mr. Hsu and blind carbon copied me, informing Mr. Hsu

23   that X-Concepts could not sell to companies outside of its distribution territory. Mr. Sajwani also

24   told Mr. Hsu that X-Concepts had been getting emails from clients inquiring why "the shape of

25   [Kozumi's] devices looks like [Ubiquiti's] M Series a lot so most of our resellers have returned

26   devices to us." (*Id.*)

27        53.    On May 7, 2010, I noticed that Netcom WISP, a company that had placed an order

28   for Ubiquiti products, used the same bank information for wire transfers that has been used by

B. MOORE DECLARATION                                14

1   Kozumi when Kozumi was a Ubiquiti Distributor.  On that day, I sent an email to Mr. Steve

2   Shaw, the contact for Netcom WISP and asked him if he was affiliated with Mr. Hsu.  A true and

3   correct copy of my email exchange with Mr. Shaw is attached hereto as Exhibit T.  Mr. Shaw

4   claimed that Netcom WISP was not affiliated with Mr. Hsu, but that it did business with Mr.

5   Hsu's independent company in Asia, called Netcom, Inc. and that Mr. Hsu introduced Mr. Shaw

6   to Ubiquiti.  Mr. Shaw also (incorrectly) claimed that Mr. Hsu was not the owner of Kozumi, only

7   the former general manager of Kozumi's Miami office and that Mr. Hsu had left Kozumi a month

8   earlier.  (*Id.*)  At the time of my email exchange with Mr. Shaw, and based on Mr. Shaw's

9   representations, I was under the impression that Mr. Hsu was no longer affiliated with Kozumi

10   and that Netcom WISP was not affiliated with either Kozumi or Mr. Hsu.  Based on these

11   impressions, Ubiquiti fulfilled Mr. Shaw's order for Ubiquiti products.

12       54.     On May 27, 2010, I received an email from Dimitrios Sidiropoulos at Aerial, a

13   Ubiquiti distributor in Greece, attached hereto as Exhibit U.  Mr. Sidiropoulos forwarded an email

14   he received from "TJ," a sales manager at Kozumi inquiring whether Aerial would be interested

15   in helping Kozumi establish a market presence in Greece.

16       55.     In response to Mr. Hsu's attempts to covertly and improperly acquire Ubiquiti

17   products through authorized Ubiquiti Distributors, I contacted some of our Ubiquiti Distributors

18   and asked them not to do business with Kozumi.

19              **My Discovery of Counterfeit Ubiquiti Products**

20       56.     On January 19, 2011, I received an email from Federico Sanguinetti of Laufquen

21   Internet, a Ubiquiti distributor in Argentina.  Attached as Exhibit V is a true and correct copy of

22   that email.  Mr. Sanguinetti informed me that a competitor of his in Argentina was selling

23   Ubiquiti products at lower prices, but the labels on the products say "Kozumi" and used a cheaper

24   Power Over Ethernet ("POE") adaptor.  Mr. Sanguinetti stated that the Kozumi products had

25   created confusion among consumers and expressed concern that the Kozumi products were

26   harming his business and asked if Ubiquiti could do something about it.

27       57.     On March 4, 2011, I received an email from Sebastian Tabellione of Microcom, a

28   Ubiquiti distributor in Argentina.  Attached as Exhibit W is a true and correct copy of that email.

B. MOORE DECLARATION                    15

1    Mr. Tabellione asked whether Ubiquiti had come to an agreement with Kozumi because Kozumi

2    was selling Ubiquiti products in Argentina at a much lower price than Mr. Tabellione is able to

3    offer for his Ubiquiti products.  Mr. Tabellione attached a spreadsheet of imports from Syntronic

4    in Argentina for Ubiquiti products to show me the price difference.  I responded to

5    Mr. Tabellione and told him that Ubiquiti was not supplying products to Syntronic and that

6    Ubiquiti was going to do everything it could to stop the sale of Kozumi's knockoff products.

7         58.    In late March or early April 2011, I was contacted by an employee at Lanbowan,

8    an approved Ubiquiti distributor in China.  That person informed me that Hoky Technologies

9    ("Hoky") in China was manufacturing counterfeit Ubiquiti products at its factory and was using

10   the Ubiquiti brand on the products.  Hoky was briefly a distributor for Ubiquiti in 2009, but it had

11   a habit of placing orders for products and not paying for them, so we refused to continue selling

12   product directly to Hoky, and instead, directed Hoky to authorized distributors in China for

13   Ubiquiti products.

14        59.    When I learned of Hoky's counterfeiting activity in April 2011 I was in Taipei,

15   Taiwan on company business with Robert Pera, Ubiquiti's Chief Executive Officer.  Mr. Pera and

16   I visited the Hoky factory in Shenzhen, China to investigate the counterfeiting allegations.  On

17   our way to the Hoky factory, the taxi driver called the Hoky factory and informed them that he

18   was bringing "two Americans" to the facility.

19        60.    When we arrived at the Hoky facility, Mr. Pera and I spoke with Mr. Kenny Deng,

20   the owner of Hoky.  Mr. Deng initially denied making counterfeit Ubiquiti goods, but then told us

21   that "everybody does it."  There were no counterfeit Ubiquiti products in plain sight at the time,

22   but we suspected that all counterfeit products were removed in response to the warning from the

23   taxi driver that he was bringing Americans to the facility.

24        61.    Our suspicions that the Hoky facility was wiped clean of counterfeit Ubiquiti

25   products before our visit were later confirmed.  In late summer 2011, we sent someone to Hoky

26   who reported back to us the number and type of counterfeit Ubiquiti products that were being

27   made by Hoky.  We also arranged for someone to pose as a potential distributor for Hoky's

28   Ubiquiti products.  That person obtained counterfeit Ubiquiti devices from Hoky for our analysis.

B. MOORE DECLARATION                        16

1      62.    After learning of Kozumi's knockoff products, I also worked with authorized

2   Ubiquiti Distributors in Argentina to acquire the fake products for inspection.  Upon acquiring

3   sample counterfeit products from Argentina and China, I sent them to Mike Taylor, Ubiquiti's

4   Senior Software Engineer, for analysis.

5      63.    Once Mike Taylor confirmed that the products being sold by Kozumi and

6   manufactured by Hoky were near duplicates of actual Ubiquiti products, Ubiquiti contacted a law

7   firm in China who worked with the Public Security Bureau in China to shut down the Hoky

8   facility in November 2011.

9      64.    Yu Cheng Lin, a Ubiquiti employee in Taiwan, was asked to go with the Chinese

10  authorities when they shut down the Hoky facility to help identify the counterfeit products.  He

11  took photos and videos of the counterfeiting manufacturing line and counterfeit products ready

12  for shipment.  I have viewed those photographs and video and they show that there were

13  thousands of counterfeit Ubiquiti products at the factory ready to be shipped.  Mr. Lin also was

14  provided with copies of shipping records from the Hoky facility showing that in October 2011

15  alone, the Hoky factory shipped 31,000 products with a value of about $1 million to multiple

16  countries including Paraguay, the Middle East, Turkey, Ukraine, and Shenzhen, China.  He was

17  also given a copy of a freight forwarder's booking form indicating that 6,000 products had just

18  been shipped from Hoky to Kozumi, for delivery in Paraguay.  (*See* Declaration of Yu Cheng Lin

19  In Support of Application for Temporary Restraining Order, ¶ __.)

20     65.    It is my understanding that the Hoky facility reopened at the end of December

21  2011 and is once again making counterfeit Ubiquiti products because Kenny Deng produced

22  documents showing that a customer in Argentina, who turned out to be William Hsu, owned a

23  trademark registration for UBIQUITI NETWORKS and Design.

24     66.    On March 20, 2012, I received an email from Federico Sanguinetti who forwarded

25  me an email he received from William Hsu.  Attached as Exhibit X is a true and correct copy of

26  the email along with a certified translation.  In the email, Hsu was claiming that the products he is

27  selling are "100% the same" as Ubiquiti products.

28

B. MOORE DECLARATION                              17

67.     Moreover, on April 4, 2012, I received two emails from a Ubiquiti Distributor in Argentina that had as attachments customs forms from the Argentina customs office.  True and correct copies of the emails are attached hereto as Exhibit Y.  The customs forms detail three separate shipments into Argentina listing "Kozumi" as the importer—Nos. 11 001 IC04 206789 V, 12 001 IC04 028743 Y and 12 001 IC04 006378 Y—all containing "Ubiquiti" products that were priced suspiciously low.  Between the three shipments, at least 5,900 "Ubiquiti" products were listed as being exported by Kozumi and being sent to Tech Depot, S.A., a company in Argentina owned by Defendant Hsu.  (*Id.*)  A screen shot from the customs office, also sent to me by a Ubiquiti Distributor in Argentina, shows that Shipment No.11 001 IC04 206789 V was routed through the Everglades Port in Fort Lauderdale, Florida.  (*Id.*)

68.     Very recently, I learned that Kozumi's counterfeiting operation is rapidly expanding around the world.  On April 20, 2012, I received an email from Dejan Dudeski of Overnet DMD, a Ubiquiti Distributor in Macedonia.  A true and correct copy of the email is attached hereto as Exhibit Z.  Mr. Dudeski informed me that he has been contacted by clients in Kosovo and Albania who are buying "Ubiquiti" products at prices lower than the price Ubiquiti sells its products to its distributors.  According to Mr. Dudeski, these products "have ubnt [Ubiquiti] software and 'look very similar to ubnt.'"

69.     I also  recently learned that Mr. Hsu owns or is affiliated with at least 5 companies in Latin America:

- Redemax S.A., Rubio Nu c/ Ad. Jara , Ed. Continental piso 9 of 904, Ciudad del Este – Paraguay (www.redemax.com.py);
- Syntronic S.A., California 2082 1° Piso Of. D-104, Capital Federal, Buenos Aires, Argentina (www.syntronic.com.ar);
- Tech Depot S.A., d/b/a/ Connectis, California 2082 ° Piso Of. D-104, Capital Federal, Buenos Aires, Argentina (www.connectis.com.ar);
- Netcom.  (www.netcom-wisp.com); and
- Omega, Av. Motes de Oca 2185, Barracas, Capital Federal 1270, Argentina (www.omegatech.com.ar).

B. MOORE DECLARATION                                          18

1    70.    I further learned that Mr. Hsu is affiliated with at least one company in Tiawan:

2  Genal Technology Ltd., Tzu-Chiang Rd., Wu-Chi District, Taichung AS 43546, Taiwan.

3  **Defendants' False Statements About Ubiquiti**

4    71.    On April 26, 2012, I received an email from Mohammed Majdi Hashim, the

5  Director of Alsafwa for Computers and Networking, a Ubiquiti Distributor in Iraq, and an email

6  from Roberto Ferreira of OIW Telecom Solutions, a Ubiquiti Distributor in Brazil. Both

7  distributors forwarded to me identical emails that they had received from an "Ivan Mikhailov" at

8  Ivan.mikhailov99@gmail.com. Attached hereto as Exhibits AA and BB are true and correct

9  copies of those emails. The "To" line of the emails indicate that it was sent to over 200 email

10  addresses, most of whom belong to authorized Ubiquiti Distributors or resellers. The emails

11  contained an article titled "Public listed Ubiquiti Networks CEO Robert Pera under investigation

12  by China authorities for using mafia ties to stop its competitors in China?" and included a picture

13  of Robert Pera. The article contains a number of false statements about Ubiquiti and Robert Pera

14  including the following:

15 • "There has been rumors from Shenzhen local authorities that some factories in
16    China producing products that are competition for Ubiquiti Networks filed a claim
17    with the local police in Shenzhen against Ubiquiti's claiming that its CEO Robert
18    Pera sent Chinese mafia to their factories to intimidate, harass and threatening
19    them to stop trying to produce technology that are competition to them."
20 • "The company has faced legal trademark problems in many countries, as they did
21    not register their trademark in most of the countries worldwide."
22 • "Ubiquiti has sold the idea that their technology is unique. As we have interviewed
23    some of the industry insiders we found out that their 'unique technology' is a
24    software protocol that they built inside their software and it seems that their
25    competition in Asia already are providing products that are similar or even
26    superior at much lower cost."

27  *Id.*

28

B. MOORE DECLARATION                    19

72.    On April 27, 2012, I learned that the same article that was in the email received by Hashim and Ferreira was also posted to the Ubiquiti Community forum page. Attached hereto as Exhibit CC is a true and correct copy of a screen shot of the article posted to the Ubiquiti Community forum page.

73.    Also on April 27, 2012, I received an email from Robert Pera who found the same false article about Ubiquiti posted to http://k.ifeng.com by a user with the moniker "leolark69." A true and correct copy of that email is attached hereto as Exhibit DD.

74.    On April 30, 2012, the same false article was posted at TianYa.cn (http://bbs.city.tianya.cn/tianyacity/content/338/1/24857.shtml), an internet forum that is also one of the most visited sites in China. The posting was made by a user with the moniker "ivanmikhailov."

75.    On May 3, 2012, a video was posted to the Chinese website s1979.com (http://www.s1979.com/shenzhen/201204/3034114830.shtml and to YouTube.com (http://www.youtube.com/watch?v=kBaescDB998) by user "Leo Zhou." The party posting the video claimed that it was evidence of a raid on a competitor's factory by the Chinese Mafia at the request of Ubiquiti. I suspect the "raid" was staged by Hsu and his cohorts.

76.    These false postings about Ubiquiti are causing significant harm to Ubiquiti, both to its reputation and financially. Our distributors are contacting us, questioning the truth of the allegations in the postings. And, following the April 30, 2012 posting at TianYa.cn, Ubiquiti's stock dropped over 20%.

**Harm to Ubiquiti**

77.    The international counterfeiting ring orchestrated by Defendants has caused, and will continue to cause, significant harm to Ubiquiti, not only in lost sales but also by lowering the value of the Ubiquiti brand that we have spent years building up worldwide. Defendants are like parasites feeding off Ubiquiti's goodwill and reputation for state-of-the art products. Defendants steal our customer base through pure deception and then tarnish Ubiquiti's reputation for quality products by providing our customers with cheap counterfeits that Defendants pass off as Ubiquiti products. This directly harms Ubiquiti, its customers, and its distributors.

B. MOORE DECLARATION                    20

78.     First, Ubiquiti's reputation is built through word of mouth, which is largely developed by and through the Ubiquiti Community of distributors, resellers, and consumers. When a consumer purchases a cheap Kozumi counterfeit product believing it to be a Ubiquiti product, that consumer's complaints go directly back into the Ubiquiti Community, causing other members of the Community to question the Ubiquiti brand. Because Ubiquiti's sales are tied to the strong Ubiquiti brand, any doubts about the brand will drive down its value, but doubts within the Ubiquiti Community will be particularly detrimental.

79.     Second, since Defendants' counterfeiting has begun, Ubiquiti's sales have dropped dramatically in Argentina and other parts of South America. I understand that our Chief Financial Officer, John Ritchie, will provide more detailed information on the drop-off in sales, as well as its effect on the company's value.

80.     Third, Defendants and their associated resellers are offering the counterfeit products at significantly lower prices than Ubiquiti or its distributors could ever meet. Defendants can offer such low prices because they use cheap materials, unqualified labor, and have no research and development costs because they stole Ubiquiti's proprietary designs, plans, and software. Defendants' unfairly low prices not only cause Ubiquiti and its distributors and resellers to lose customers who naturally will seek to pay less for what they believe is the same product, they also set unfair expectations about Ubiquiti's pricing.

81.     Fourth, Ubiquiti stands by its generous warranty to replace all defective Ubiquiti products. This may result in the replacement of counterfeit products because the counterfeit products are such exact copies that distributors of our genuine products, who manage the return process, cannot tell the difference between the products. Recently, I received a direct complaint from a customer in Argentina who purchased what he believed at the time were genuine Ubiquiti products (but were in fact counterfeit products), and many stopped working shortly after he purchased them. Our policy of standing behind our customers contributes to our strong reputation as being customer-focused, but it has direct costs to the company when we replace counterfeit products with real products at no cost to our customers.

82.     Fifth, the process of returning products is not always easy for our customers.  It is unfair to them that they are burdened with the need to replace products because they were tricked into buying substandard counterfeit products.  In fact, it is likely that many customers who are dissatisfied with the performance of the counterfeit Ubiquiti products never bother to return them at all, and instead buy replacement products on their own.  To the extent that they replace the defective counterfeit products with third-party products, they represent lost customers for Ubiquiti.

83.     Sixth, the MAC ID that is provided with each Ubiquiti product is a unique identifying code that is supposed to be used by only one product to prevent interference in the wireless spectrum.  We have noted that Hoky is reusing our genuine MAC ID on its counterfeit products.  Where two products within a region both have the same MAC ID, their performance will be poor, at best.  In some cases, one or both of the products may not work at all.  Ubiquiti has no means to track where MAC IDs are used, which is the reason that they were designed to be unique to a particular product.  So, Ubiquiti is not able to tell customers that its problems are due to a rogue MAC ID that has been activated in the same region.  Instead, all that we can do is replace products when customers come to us with a warranty claim.

84.     Seventh, Defendants' counterfeiting harms our committed distributors.  Many of our distributors are small businesses that count on sales of our products as a significant portion of their revenue.  When Defendants are offering counterfeit Ubiquiti products at cutthroat pricing, our distributors simply cannot compete.  We have recently had distributors in South America and Europe begging us to do something about the counterfeiting because they are losing a lot of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of May, 2012, in Prague, Czech Republic, under the laws of the United States.

_____
Benjamin Moore

B. MOORE DECLARATION                                22