IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBIQUITI NETWORKS, INC., | No. C 12-2582 CW |
| Plaintiff, | ORDER DENYING EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND SETTING EXPEDITED BRIEFING SCHEDULE |
| v. | |
| KOZUMI USA CORP., SHAO WEI HSU, LILIA KUNG, and DOES 1-100, | |
| Defendants. | |

Plaintiff Ubiquiti Networks Inc., proceeding ex parte, applies for a temporary restraining order (TRO) and an order to show cause why a preliminary injunction should not be granted. Defendants Kozumi USA Corporation, Shao Wei Hsu and Lilia Kung have not been served. This matter will be decided on the papers that have been submitted. Having considered all of the papers filed by Plaintiff, the Court denies the application for an ex parte TRO. An expedited briefing will apply once Plaintiff has served Defendants.

BACKGROUND

The following is Ubiquiti's version of events, taken from its complaint and the declarations and documents submitted in support of its motion. Ubiquiti is incorporated in Delaware with its principal place of business in San Jose, California. It currently offers over thirty products to the global Wireless Internet Service Provider (WISP) market in the United States

and in over sixty-five countries around the world. Ubiquiti does not have its own sales force, but relies on the Ubiquiti Community, a large community of network operators, service providers and distributors, to market its products. Distributors enter into contracts with Ubiquiti to distribute its products in specified regions throughout the world and to provide its products to local re-sellers. The re-sellers sell the products to end-users. Ubiquiti actively protects its corporate name, product names, and proprietary software. It currently holds trade registrations in the United States for seven marks.

Defendant Kozumi, a Florida corporation, is a former distributor of Ubiquiti products. Defendant Hsu, a citizen of Brazil, is Kozumi's sole officer and director, as well as its registered agent. Hsu manages Kozumi's distribution and manufacturing activities from his home or office in Florida. Defendant Kung, Hsu's wife, is also a citizen of Brazil and resides in Florida.

In April 2008, Hsu asked Ubiquiti for the rights to distribute its products in Latin America. On May 16, 2008, a Distribution Agreement was signed which clearly stated that Ubiquiti owned all rights to the Ubiquiti Networks name and trademarks. In mid-September 2009, Ben Moore, Ubiquiti's Vice President of Business Development, visited the Kozumi website and discovered that Kozumi was offering products that appeared to be copies of Ubiquiti's products, using similar packaging and graphics. Ubiquiti terminated Kozumi's distributorship.

2

Thereafter, Hsu tried to obtain Ubiquiti products through other Ubiquiti distributors. Hsu formed new companies and hired new employees to pose as re-sellers and covertly tried to obtain Ubiquiti products. In response, Ubiquiti contacted some of its distributors and asked them not to do business with Kozumi.

In 2011, Moore received emails from two different Ubiquiti distributors in Argentina informing him that "Ubiquiti" products were being sold in Argentina at much lower prices than they could afford to offer. The products were being sold by a company called Tech Depot, which Ubiquiti later discovered was owned by Defendant Hsu. Ubiquiti acquired some of Tech Depot's products, determined that they were counterfeit, and tracked their manufacture to a plant owned by Hoky Technologies in Shenzhen, China. The counterfeit products appeared to be identical to Ubiquiti's products and included Ubiquiti's name, corporate address, domain name, logo and trademark.

Once Ubiquiti confirmed that the products being manufactured by Hoky were counterfeits, it contacted a Chinese law firm to seek a shut-down of Hoky's facility. At that time, Ubiquiti thought Hoky was the driving force behind the counterfeiting ring and assumed the counterfeiting would end with the shut-down of the factory. However, in December 2011, the Chinese Public Security Bureau informed Ubiquiti that Hoky's owner, Kenny Deng, was being released because he had produced documents showing that a customer in Argentina owned a trademark for Ubiquiti Networks and Design. Ubiquiti

3

1  subsequently discovered that Hsu wrongfully obtained an
2  Argentinian registration for Ubiquiti Networks and Design.
3      After Deng's release, the Hoky facility reopened and
4  resumed making counterfeit Ubiquiti products and, through
5  Defendants, selling them in South America and throughout the
6  world.  On April 4, 2012, Ubiquiti obtained Argentinian customs
7  forms detailing three shipments into Argentina listing Kozumi
8  as the importer and low-priced "Ubiquiti" products as the
9  contents.  At least 5,900 "Ubiquiti" products were listed as
10 being imported by Kozumi.  In April 2012, Ubiquiti learned of
11 counterfeit products being sold in Kosovo and Albania.
12     Ubiquiti has learned that Hsu is the operator behind a
13 worldwide counterfeiting scheme, which includes fraudulently
14 acquiring registrations for various Ubiquiti trademarks.  For
15 instance, Hsu acquired an Argentinian registration for UBIQUITI
16 NETWORKS & Design from Daniel Alejandro Pons and Guillermo
17 Cristiani, owners of a former Ubiquiti re-seller.  On August
18 20, 2010, Jung Hsun Peng, a shareholder of one of Hsu's
19 affiliated entities, filed applications in Argentina for three
20 of Ubiquiti's trademarks.  The trademarks are brand-names of
21 some of Ubiquiti's top-selling products.  In the United States,
22 Defendant Kung filed an application for the mark UBIQUITI.  The
23 email address associated with this filing is Hsu's email
24 address and the physical address is Kozumi's headquarters in
25 Miami, Florida.
26     Ubiquiti Chief Executive Officer Robert Pera emailed Hsu
27 and his brother Daniel Hsu asking for their assistance in

4

1  transferring all Ubiquiti Networks trademarks registered in
2  Argentina to Ubiquiti as a sign of good faith.  Hsu responded
3  that Kozumi began to buy products from Hoky after Ubiquiti
4  ended its distributorship with Kozumi.  Hsu stated that he
5  "acquired the Ubiquiti brand" from an Argentinian company
6  called Ditelco.
7      Subsequently, Hsu stated that he would give Ubiquiti its
8  trademarks in Argentina if it withdrew its legal action in
9  China against Deng, guaranteed to take no further legal action
10 against Deng or Hsu and agreed to cover Deng's and Hsu's losses
11 of $2.5 million.  Instead of responding to Hsu's demands, on
12 April 2, 2012, Ubiquiti filed a trademark lawsuit in Argentina
13 against Hsu.
14     Since Defendants began counterfeiting Ubiquiti's products,
15 Ubiquiti's sales have dropped dramatically in Argentina and
16 parts of South America.  Ubiquiti has lost sales of at least
17 $6,954,312 in six months in Argentina alone.  Defendants can
18 offer their counterfeit products at much lower prices than
19 Ubiquiti's because they use low-quality materials and
20 unqualified labor and have no research and development costs in
21 that they use Ubiquiti's proprietary designs, plans and
22 software.  Defendants' low priced counterfeit products cause
23 Ubiquiti, its distributors and re-sellers to lose customers,
24 sales and goodwill.
25     Hsu has posted false statements on websites about Ubiquiti
26 and its CEO which are designed to hurt their reputations.
27 After one of these false stories was published in
28

5

Yahoo!Finance, Ubiquiti's stock was downgraded from "Buy" to "Hold," and from "Outperform" to "Perform." After Ubiquiti announced that it would be spending time and money fighting the global counterfeiting of its products, its stock price declined significantly.

Based on these allegations, Ubiquiti brings the following causes of action against Defendants: (1) counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1114; (2) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (3) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6)(A); (5) violation of California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 402(c); (6) direct copyright infringement under 17 U.S.C. § 101; (7) contributory copyright infringement; (8) vicarious copyright infringement; (9) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (10) false advertising, Cal. Bus. & Prof. Code § 17500; (11) common law infringement and unfair competition; (12) libel; and (13) violation of the Tariff Act, 19 U.S.C. § 1526. Ubiquiti seeks an order enjoining Defendants from using any Ubiquiti trademark, disparaging Ubiquiti, its officers or its directors, or competing unfairly with Ubiquiti. Ubiquiti also seeks an order directing Defendants to deliver for destruction or to show proof of destruction of all catalogs, articles, packages, wrappers, products, displays, and other things that bear the Ubiquiti trademark or any mark that

6

is confusingly similar to the Ubiquiti trademark. Plaintiff also seeks an order restraining Defendants from transferring, disposing of or secreting any of their money, stocks, bonds, real or personal property or other assets without prior approval of the Court.

## LEGAL STANDARD

A temporary restraining order may be issued only if "immediate and irreparable injury, loss, or damage will result to the applicant" if the order does not issue. Fed. R. Civ. P. 65(b). To obtain a temporary restraining order, the moving party must establish either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in the moving party's favor. Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

The test for granting a temporary restraining order, like that for a preliminary injunction, is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." Id. The moving party ordinarily must show "a significant threat of irreparable injury," although there is "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174, 175 (9th Cir. 1987), and vice versa.

7

A temporary restraining order may be granted without notice to the adverse party only if it clearly appears from specific facts shown by affidavit or in the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition, and the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give notice and/or the reasons that notice should not be required. Fed. R. Civ. P. 65(b).

## DISCUSSION

The Court has reviewed Ubiquiti's filings and determines that it has submitted prima facie evidence of federal jurisdiction over this case and personal jurisdiction of Defendants in this forum. The issue will be revisited if, after Defendants are served, they dispute subject matter or personal jurisdiction.

I. Subject Matter Jurisdiction

Citing Reebok Int'l, Ltd. v. Marnatech Ents., Inc., 970 F.2d 552, 554 (9th Cir. 1992), Ubiquiti argues that extraterritorial jurisdiction under the Lanham Act extends to this action.

The Lanham Act provides a broad jurisdictional grant. Id. A three-part test is used to determine if extraterritorial jurisdiction exists under the Lanham Act: (1) there must be some effect on American foreign commerce; (2) the effect must be sufficiently great to present a cognizable injury to the plaintiffs; and (3) the interests of and links to American

8

1 foreign commerce must be sufficiently strong in relation to
2 those of other nations to justify an assertion of
3 extraterritorial authority.  Id.

4 Ubiquiti alleges and presents documents that show that
5 Defendants are organizing and directing the counterfeiting of
6 Ubiquiti's products from the United States, that the sales of
7 counterfeit products have decreased the sales of Ubiquiti's
8 genuine products in Argentina and other countries where
9 Defendants have been selling their counterfeit goods and that
10 the counterfeit sales have decreased the market value of
11 Ubiquiti's stock and capitalization.  These allegations meet
12 the three requirements cited in Reebok to establish
13 extraterritorial jurisdiction.

14 The facts here are similar to those in Reebok, which held
15 that there was extraterritorial jurisdiction over the
16 defendants who were organizing and directing counterfeiting
17 activities in the United States by having shoes made in Asia
18 and selling them in Mexico.  Reebok, 970 F.2d at 554-55.  Here,
19 Ubiquiti alleges that Defendants are organizing and directing
20 counterfeiting activities in the United States by having the
21 counterfeit products manufactured in China and sold in South
22 America and other countries.  In Reebok, the court held that
23 the first two prongs of the jurisdictional test were met
24 because the defendant's sales of counterfeit shoes decreased
25 the sale of genuine Reebok shoes in Mexico and directly
26 decreased the value of Reebok's consolidated holdings.  Id.
27 Similarly, Ubiquiti alleges that Defendants' counterfeit sales
28

9

are decreasing its own sales and causing a decline in its stock price and consolidated holdings. Therefore, the first two prongs of the test for extraterritorial jurisdiction are satisfied. The third prong, which requires a comparison between American commerce in relation to the commerce of other nations, involves the balancing of the following seven factors: (1) the degree of conflict with foreign law or policy; (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations; (3) the extent to which enforcement by either state can be expected to achieve compliance; (4) the relative significance of effects on the United States as compared with those elsewhere; (5) the extent to which there is explicit purpose to harm or affect American commerce; (6) the foreseeability of such effect; and (7) the relative importance to the violations charged of conduct within the United States as compared with conduct abroad. Id. at 555. The Court has reviewed these factors and finds that the majority of them weigh in favor of extraterritorial jurisdiction. Therefore, Ubiquiti has made a prima facie showing that this Court may exercise extraterritorial jurisdiction over this case.

II. Personal Jurisdiction

Citing Panavision Int'l, LP v. Toeppen, 141 F.3d 1316, 1322 (9th Cir. 1998), Ubiquiti argues that Defendants' targeting of Ubiquiti by registering Ubiquiti's trademarks and attempting to extort millions of dollars from Ubiquiti

10

satisfies the personal availment prong of the effects test for specific personal jurisdiction.

Specific jurisdiction is analyzed using a three-prong test: (1) the non-resident defendant must purposefully direct its activities or consummate some transaction with the forum or a resident thereof, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987). Each of these conditions is required for asserting jurisdiction. Insurance Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1270 (9th Cir. 1981).

A showing that a defendant "purposefully availed" itself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004). A purposeful availment analysis is most often used in suits sounding in contract. Id.

A showing that a defendant "purposefully directed" its conduct toward a forum state "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." Id. at 803. "A

11

purposeful direction analysis . . . is most often used in suits sounding in tort." Id. at 802. Purposeful direction may be established under the "effects test" where the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002).

Panavision addressed claims under the Federal Trademark Dilution Act and the California Anti-dilution statute, considered these to be akin to tort claims, and applied the effects test in analyzing specific jurisdiction. Panavision, 141 F.3d at 1319, 1321. The defendant purposefully registered Panavision's trademarks as his domain names on the Internet to force Panavision to pay him money. Id. The court held that the brunt of the harm was felt in California, as the defendant knew it would be, because Panavision, although a Delaware corporation, had its principal place of business in California. Id. Therefore, under the effects test, the purposeful availment requirement for personal jurisdiction was satisfied. Id. Here, too, Defendants' activities, though not occurring in California, injured Ubiquiti which has its principal place of business here. Thus, the purposeful availment requirement for specific jurisdiction is satisfied.

The second requirement for specific jurisdiction is that the claims arise out of the defendant's forum-related activities. In other words, the court must determine if the plaintiff would not have been injured "but for" the defendant's

12

conduct directed at it in the forum. Id. at 1322. The court in Panavision held that the defendant's registration of the plaintiff's trademarks as his own domain name had the effect of injuring the plaintiff in California. Id. The same holds true in this case where, but for Defendants' actions, the injury to Ubiquiti would not have occurred. Therefore, the second requirement for personal jurisdiction is satisfied.

If the first two prongs for specific jurisdiction have been met, the defendant has the burden of presenting a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Id. Seven factors are considered in assessing whether the exercise of jurisdiction over a non-resident defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the forum state's affairs, (2) the burden on the defendant, (3) conflicts of law between the forum state and the defendant's home jurisdiction, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the dispute, (6) the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 128 (9th Cir. 1995); Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991). Ubiquiti has made a prima facie showing that specific jurisdiction is reasonable.

Therefore, Ubiquiti has made a prima facie showing that the three requirements for personal specific jurisdiction are met.

III. Request for Ex Parte TRO

As stated above, a TRO may be issued without providing the opposing party an opportunity to be heard only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Ubiquiti has not submitted an affidavit with a showing of immediate and irreparable harm to justify granting the relief it seeks without first offering Defendants an opportunity to be heard. Although, in its motion, Ubiquiti argues that "there is a high likelihood that Defendants will transfer assets out of the United States if they are not immediately restrained from doing so by this Court," it does not submit an affidavit attesting to this, nor does it provide any other evidence supporting this claim. Furthermore, although Ubiquiti has not served Defendants, its counsel attests to the fact that she has sent emails to Defendants notifying them of Ubiquiti's intent to seek a TRO to prevent them from using Ubiquiti's trademarks and damaging Ubiquiti's goodwill and to freeze their assets. Because Ubiquiti has informed Defendants of its intent to file this action, if Defendants intended to transfer assets out of this country as a result of this lawsuit, they have had time to do so, and the few days necessary for a response from them should not prejudice Ubiquiti.

Although Ubiquiti has shown that it will suffer irreparable harm from Defendants' continued counterfeiting and

14

selling of Ubiquiti's products, because this situation has been going on for months, if not years, the few additional days to serve Defendants and receive their response will not add significantly to Ubiquiti's injury.

Ubiquiti's request for immediate ex parte relief is therefore denied. Ubiquiti must serve Defendants with its complaint, declarations and this Order. Defendants shall file a response to Ubiquiti's motion for a TRO by 12:00 p.m. three court days after at least one of them has been served with the aforementioned documents. Ubiquiti may, if it wishes, file a reply by 12:00 p.m. the following day. The Court will take the matter under submission on the papers and schedule a hearing on Ubiquiti's motion for a preliminary injunction as appropriate.

IT IS SO ORDERED.

Dated: May 25, 2012

CLAUDIA WILKEN
United States District Judge

15