1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5              FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

8   UBIQUITI NETWORKS, INC.,                No. C 12-2582 CW

9          Plaintiff,                       ORDER GRANTING, IN
                                            PART, UBIQUITI'S
10      v.                                  APPLICATION FOR
                                            TEMPORARY
11  KOZUMI USA CORPORATION, SHAO WEI        RESTRAINING ORDER,
    HSU, and LILIA KUNG,                    GRANTING DEFENDANTS'
                                            MOTION TO ACCEPT
12         Defendants.                      OBJECTIONS AND
                                            SETTING DATE FOR OSC
13  _____/       HEARING

14

15       On May 18, 2012, Plaintiff Ubiquiti Networks, Inc. filed an

16  ex parte application for a temporary restraining order (TRO)

17  against Defendants Kozumi USA Corporation, Shao Wei Hsu and Lilia

18  Kung based upon its claims for trademark infringement under the

19  Lanham Act.  On May 25, 2012, the Court denied the ex parte

20  application for a TRO, ordered Ubiquiti to serve Defendants and

21  set an expedited briefing schedule.  Ubiquiti has served

22  Defendants, who have filed an opposition, and Ubiquiti has filed a

23  reply.  With leave of Court, Defendants have also filed a sur-

24  reply and Ubiquiti has filed a further reply.  Defendants have

25  filed a motion to submit separate objections to Ubiquiti's

26  evidence and Ubiquiti opposes this motion.  The motions were taken

27

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  under submission and decided on the papers.  Having considered all

2  of the papers filed by the parties, the Court grants Defendants'

3  motion to file objections to evidence and grants, in part, the

4  application for a TRO.

BACKGROUND

In the May 25, 2012 Order, the Court stated Ubiquiti's

version of the facts because Defendants had not yet been served.

The Court adopts the facts from its previous order with the

following changes and additions that are taken from both parties'

submissions.  The facts are undisputed, except as noted.

Ubiquiti is incorporated in Delaware with its principal place

of business in San Jose, California.  It currently offers over

thirty products to the global Wireless Internet Service Provider

(WISP) market in the United States and in over sixty-five

countries around the world.  Ubiquiti does not have its own sales

force, but relies on the Ubiquiti Community, a large community of

network operators, service providers and distributors, to market

its products.  Distributors enter into contracts with Ubiquiti to

distribute its products in specified regions throughout the world

and to provide its products to local re-sellers.  The re-sellers

sell the products to end-users.  Ubiquiti actively protects its

corporate name, product names, and proprietary software.  It

currently holds registrations in the United States for seven

marks.

United States District Court
For the Northern District of California

Defendant Kozumi, a Florida corporation with its principal place of business in Florida, has been in the business of distributing networking hardware since September 2006.  Kozumi distributes multiple suppliers' networking hardware in South America and parts of Eastern Europe.  Since its inception, the vast majority of Kozumi's sales have been outside the United States and it has never sold any product in the State of California.  Hsu, whom Defendants refer to as Wu, is the owner and sole director of Kozumi.  Kung was married to Hsu and they have three minor children.  Kung and Hsu were divorced on April 26, 2012.  Kung declares that she is a stay-at-home mother with no ownership or other interest in Kozumi and no involvement with any of the business transactions at issue in this lawsuit, except that, in 2011, she applied to register the word "UBIQUITI" as a trademark in the United States.

In May 2008, Kozumi became an official distributor of Ubiquiti products in Latin America, including Argentina.  Hsu's understanding was that the distributorship agreement did not bar Kozumi from developing its own products and, in 2009, Kozumi began to develop its own line of networking hardware, as an alternative to Ubiquiti hardware.  Hsu Dec. ¶¶ 9, 10.  In mid-September 2009, Ben Moore, Ubiquiti's Vice President of Business Development, visited the Kozumi website and discovered that Kozumi was offering products under its own brand, with packaging and graphics very similar to the Ubiquiti products that Kozumi was selling.  Moore

Dec. ¶ 48.   Moore determined that Kozumi was selling its own products that directly competed with Ubiquiti products and, for that reason, terminated Kozumi's distributorship agreement.   Moore Dec. ¶ 48.   Moore was concerned that, if Kozumi remained an Ubiquiti distributor, Hsu would use the strength of the Ubiquiti brand to draw resellers to its product offerings, only to sell them Kozumi-branded products.   Moore Dec. ¶ 48.   On November 9, 2009, Kozumi received an email from Moore indicating that Ubiquiti was terminating Kozumi's distributorship due to "pushback from existing distributors with pricing and some of the new products released by Kozumi."   Hsu Dec., Ex. A, November 9, 2009 Moore email.

After Kozumi's distributorship was terminated, it purchased Ubiquiti products from other authorized Ubiquiti distributors "for redistribution through partnered companies in Argentina."   Hsu Dec. ¶ 11.   Between November 2009 and December 2011, Kozumi purchased thousands of units of Ubiquiti products through Ubiquiti distributors and resellers, nearly 100% of which were imported into Argentina.   Hsu Dec. ¶ 11.   During this time, Ubiquiti told its distributors to stop selling to Kozumi.   However, Kozumi was able to continue to purchase Ubiquiti products from several resellers and Kozumi continued to ship Ubiquiti products to South America.   Hsu Dec. ¶ 12.   Moore declares that, because Hsu was attempting to "covertly and improperly acquire Ubiquiti products through authorized Ubiquiti Distributors, I contacted some of our

United States District Court
For the Northern District of California

Ubiquiti Distributors and asked them not to do business with Kozumi." Moore Dec. ¶ 55. On March 24, 2011, Moore received an email from a Ubiquiti distributor in Argentina indicating that Kozumi was selling Ubiquiti products in Argentina at a much lower price than he was able to offer for his Ubiquiti products. Moore Dec. ¶ 57. Moore replied that "Ubiquiti was going to do everything it could to stop the sale of Kozumi's knockoff products." Moore Dec. ¶ 57.

Meanwhile, in August 2010, Kozumi was threatened in Argentina with legal action by Ditelco, a former distributor of Ubiquiti hardware, which owned a trademark of the words "UBIQUITI NETWORKS" and of the Ubiquiti logo, in Argentina. In 2011, Kozumi acquired this trademark and logo from Ditelco. In his declaration, Hsu states that he paid $250,000 for the trademark and logo. Hsu Dec. ¶ 15. In an email to Robert Pera, Ubiquiti's Chief Executive Officer (CEO), Hsu stated that he paid $350,000 for them. Hsu Dec., Ex. 5 at 2. Ubiquiti claims that he paid 200 pesos, or fifty dollars, for them. Hsu states that fifty dollars was the registration fee, not the price he paid for the trademark itself.

In mid-2011, Hsu looked for a supplier of networking hardware with specifications similar to the Ubiquiti products Kozumi had sold and was referred to Kenny Deng at Hoky Technologies in Shenzhen, China. Deng said that he could procure Ubiquiti products from the Ubiquiti factory in China and sell them to Hsu. Hsu also contracted with Hoky to produce a new brand of networking

United States District Court
For the Northern District of California

products "in the same genre as Ubiquiti's hardware, called
'ZoneWave,' but which used different designs from that of
Ubiquiti."  Hsu Dec. ¶ 17.  Between July 2011 and December 2011,
Kozumi placed orders with Hoky for about two million dollars'
worth of Ubiquiti and ZoneWave products.  According to Hsu, Hoky
shipped products to Kozumi directly from China to Argentina,
without going through the United States.  Hsu Dec. ¶ 18.

In summer 2011, Moore learned that the Hoky facility was
manufacturing counterfeit Ubiquiti products.  Moore Dec. ¶¶ 58-61.
Moore worked with authorized Ubiquiti distributors in Argentina to
acquire "fake" Ubiquiti products manufactured by Hoky and sent
them to Mike Taylor, Ubiquiti's Senior Software Engineer, for
analysis.  Moore Dec. ¶ 62.  Taylor determined that the Hoky
product appeared almost identical to the real Ubiquiti products,
including Ubiquiti's name, domain name, logo and AIRMAX trademark.
Taylor Dec. ¶ 2(a).  Once Taylor confirmed that the products
manufactured by Hoky and sold by Kozumi were near duplicates of
actual Ubiquiti products, Ubiquiti contacted a law firm in China
which worked with the Public Security Bureau in China to shut down
the Hoky facility.  Moore Dec. ¶ 63.

Yu Cheng Lin, a Ubiquiti employee in Taiwan, went with the
Chinese authorities on November 17, 2011, when they shut down the
Hoky facility and took photographs and videos of the
counterfeiting manufacturing line and products ready for shipment.
Moore Dec. ¶ 64; Lin Dec. ¶ 10.  Lin saw and photographed

"thousands of counterfeit products labeled with the Ubiquiti, Nanostation and Airos trademarks." Lin Dec. ¶ 11. The Chinese police confiscated Hoky's shipping records. Lin Dec. ¶ 11. Lin obtained a copy of a shipping document that showed that, on November 16, 2011, 6,000 units of counterfeit Ubiquiti NanoStation Loco M5 products were shipped from the Hoky facility to Kozumi with a final destination in Paraguay. Lin Dec. ¶ 11, Ex. D. The Chinese police closed the Hoky factory and took Deng into custody. In December 2011, Deng was released from custody because his production of Ubiquiti-branded products, even if using Ubiquiti's hardware designs, was apparently legal in China in that the products were sold, for export to Argentina, to Kozumi, which owned the Ubiquiti trademark in Argentina. Hsu Dec. ¶¶ 20-21.

Hsu declares that, although the Hoky factory reopened, Kozumi has not purchased any Ubiquiti-branded products from Hoky since December 15, 2011, but has continued to purchase Ubiquiti products on the secondary market from Ubiquiti-recognized distributors and re-sellers. Hsu Dec. ¶ 22. Moore declares that, on April 4, 2012, he received, as attachments to two emails from a Ubiquiti distributor in Argentina, Argentinean customs forms indicating that Kozumi sent three shipments of Ubiquiti products to Tech Depot, a company owned by Hsu in Argentina, that were "priced suspiciously low." Moore Dec. ¶ 67, Ex. Y. Moore also states that one of the shipments was routed through the Everglades Port in Fort Lauderdale, Florida. Moore Dec. ¶ 67, Ex. Y. However,

7

the exhibit is in Spanish and the claim that the shipment was routed through Florida is not confirmed.

On December 22, 2011, Hsu received an email from Ubiquiti CEO Pera stating that he did not think Kozumi was aware of Hoky's counterfeiting, and asking that Kozumi surrender the Argentinean Ubiquiti trademark to Ubiquiti as a gesture of good faith.  Hsu responded that he would consider selling the Argentinean trademark for a certain price and with certain conditions.  A series of email exchanges followed which appear to constitute negotiation of the terms and conditions of Kozumi's sale of the Argentinean trademark to Ubiquiti.  Hsu Dec., Ex. ¶¶ 25-30, Ex. 5.  Ubiquiti characterizes these emails as Hsu's and Kozumi's attempt to extort Ubiquiti by purporting to sell the trademark and logo to Ubiquiti even though Ubiquiti is the rightful owner.

On April 2, 2012, Ubiquiti filed a trademark lawsuit in Argentina against Hsu seeking (1) nullification of Hsu's trademarks of the words "UBIQUITI NETWORKS" and the Ubiquiti logo on the basis that they were obtained in bad faith; (2) dismissal of Hsu's opposition to Ubiquiti's own trademark application in Argentina; (3) sustaining of Ubiquiti's oppositions to Hsu's recently filed Argentinean trademark applications on the ground that they were fraudulent; (4) an injunction preventing further use of any Ubiquiti trademarks; and (5) damages.  McCollum Dec. ¶ 3.

**United States District Court**
For the Northern District of California

Ubiquiti's application for a trademark for the words "UBIQUITI NETWORKS" in the United States had been rejected on December 1, 2005.  <u>See</u> Shang Dec., Ex. A., United States Patent and Trademark Office (PTO) office action.  On April 6, 2012, Ubiquiti filed another trademark application with the PTO for the words "UBIQUITI NETWORKS."  <u>See</u> Shang Dec., Ex. B.  In its complaint, Ubiquiti alleges that "consumers and competitors alike throughout the world have come to recognize Ubiquiti marks, including UBIQUITI [and] UBIQUITI NETWORKS . . . as symbols of Ubiquiti's excellence in wireless communications products."  Comp. ¶ 38.  Ubiquiti owns in the United States the trademarks for AIROS, AIRMAX, UBNT, AIRGRID, AIRCONTROL, AIRVIEW and UNIFI. Comp. ¶¶ 26-32.

In its reply, Ubiquiti states that, since it filed its original TRO request, it has established that Kozumi's new product, ZoneWave, incorporates intellectual property stolen from Ubiquiti.  In supplemental declarations, Ubiquiti states that it has obtained a ZoneWave product from an employee at the Hoky plant, analyzed it and determined that the product uses Ubiquiti software, firmware, and circuit board layouts.  Supp. Dec. of Michael Taylor ¶ 2(a)-(g).  Taylor states that "much of the internal make-up of the ZoneWave product is identical to the counterfeit Ubiquiti products--Defendants just changed the packaging."  <u>Id.</u>  Ubiquiti's AIROS trademark displays on the

United States District Court
For the Northern District of California

screen when a user logs in on a ZoneWave product.  Id. ¶ 2, Comp. ¶ 20.

In Hsu's supplemental declaration, he states that, although he contracted with Hoky to produce ZoneWave products in mid-2011, before the Hoky factory was closed by the Chinese authorities, he has not received any final ZoneWave products, he has not sold any ZoneWave products and, due to Hoky's financial troubles resulting from the December 2011 shut-down of its factory, he does not know if Hoky will be able to fulfill its obligation to provide ZoneWave products.  Hsu Supp. Dec. ¶ 2.  Hsu states that the product Ubiquiti acquired and analyzed is not a ZoneWave product, because final ZoneWave products are still in the development phase and, when they are complete, they will not use any Ubiquiti copyrighted software and will have a design different from Ubiquiti products.  Hsu Supp. Dec. ¶ 3.

In its further reply to Defendants' sur-reply, Ubiquiti cites a May 7, 2012 email from Hsu to a former Ubiquiti distributor in Dubai, in which Hsu stated, "I have many customers that contacted me that wanted to become my distributors in middle east.  I have now one in Iraq/Dubai and other [sic] in Lebanon.  I can sell to you if you want to try our solution . . ."  Doc. No. 8, McCollum Dec., Ex. I.  In the email, Hsu also stated:

> The only product that can beat Ubiquiti or make a dent o [sic] Ubiquiti's market share has to be a product that can be compatible with the Airmax TDMA. . . . But Ubiquiti has been too dominant with the Airmax.  We are the only company that is selling a product that works the same as theirs. . . .

Ubiquiti stock fell from $35.99 to $26 in 3 days.  They lost around USD 800 million market cap in 3 days.  And this is not over.  They are doing damage control but as they committed a crime we will continue to release strong evidence that Ubiquiti sent the mafia to us. . . . I certainly welcome all the allies that want to fight Ubiquiti [sic] bullying behavior. . . . If you have some evidence that we can present I think that can cause them really very big trouble.

Id.

LEGAL STANDARD

A temporary restraining order may be issued only if "immediate and irreparable injury, loss, or damage will result to the applicant" if the order does not issue.  Fed. R. Civ. P. 65(b).  To obtain a temporary restraining order, the moving party must establish either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in the moving party's favor.  Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

The test for granting a temporary restraining order, like that for granting a preliminary injunction, is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness."  Id.  "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm

11

to plaintiff might offset a lesser showing of likelihood of success on the merits." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3 1127, 1131 (9th Cir. 2011).

EVIDENTIARY OBJECTIONS

Defendants object to certain evidence presented by Ubiquiti. The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually.  To the extent that the Court relies on evidence to which Defendants object, such evidence has been found admissible and the objections are overruled.

DISCUSSION

In the May 25, 2012 Order, the Court found that Ubiquiti had submitted prima facie evidence of federal subject matter jurisdiction and personal jurisdiction over Defendants in this forum.  Defendants dispute both.

I. Subject Matter Jurisdiction

Subject matter jurisdiction is a threshold issue which goes to the power of the court to hear the case.  Federal subject matter jurisdiction must exist at the time the action is commenced.  <u>Morongo Band of Mission Indians v. Cal. State Bd. of Equalization</u>, 858 F.2d 1376, 1380 (9th Cir. 1988).  A federal court is presumed to lack subject matter jurisdiction until the contrary affirmatively appears.  <u>Stock W., Inc. v. Confederated Tribes</u>, 873 F.2d 1221, 1225 (9th Cir. 1989).

Citing Reebok Int'l, Ltd. v. Marnatech Ents., Inc., 970 F.2d 552, 554 (9th Cir. 1992), Ubiquiti argues that, although it alleges only extraterritorial activities, this Court has jurisdiction over this case pursuant to the Lanham Act.  The Lanham Act provides a broad jurisdictional grant that extends to all commerce which may lawfully be regulated by Congress.  Id. "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." Steel v. Bulova Watch Co., Inc., 344 U.S. 280, 286 (1952); Van Doren Rubber Co. Inc. v. Marnatech Ents., Inc., 1989 U.S. Dist. LEXIS 17323 *6 (S.D. Cal.).  A three-part test is used to determine if a court has extraterritorial jurisdiction under the Lanham Act:  (1) there must be some effect on American foreign commerce; (2) the effect must be sufficient to present a cognizable injury to the plaintiffs; and (3) the interests of and links to American foreign commerce must be strong enough in relation to those of other nations' commerce to justify an assertion of extraterritorial authority.  Reebok, 970 F.2d at 554. The first two criteria for extraterritorial jurisdiction may be met even where all "challenged transactions occurred abroad, and where injury seems to be limited to the deception of consumers abroad, as long as there is monetary injury in United States to an American plaintiff").  Love v. Associated Newspapers, Ltd., 611 F.3d 601, 613 (9th Cir. 2010); Reebok, 970 F.2d at 554-55.

United States District Court
For the Northern District of California

The third prong, which requires a comparison between American foreign commerce and the commerce of other nations, involves the balancing of the following seven factors: (1) the degree of conflict with foreign law or policy; (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations; (3) the extent to which enforcement by either state can be expected to achieve compliance; (4) the relative significance of effects on the United States as compared with those elsewhere; (5) the extent to which there is explicit purpose to harm or affect American commerce; (6) the foreseeability of such effect; and (7) the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.  Id. at 555.

The Court reaffirms its finding in the May 25, 2012 Order that the facts alleged here appear to meet the first two prongs for jurisdiction under the Lanham Act.  The Court now further addresses the seven factors composing the third prong for extraterritoriality jurisdiction--how the interests of and links to American foreign commerce compare to those of other nations' commerce.

A. Conflict with Foreign Law or Policy

On April 2, 2012, Ubiquiti filed a trademark lawsuit in Argentina seeking nullification of Hsu's trademark of the words "UBIQUITI NETWORKS" and of the Ubiquiti logo.

Relying on Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2nd Cir. 1956), and George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536, 540 (2nd Cir. 1944), Defendants argue that this litigation is substantially likely to conflict with that in Argentina because Hsu owns a valid trademark to the words "UBIQUITI NETWORKS" and the Ubiquiti logo in that country.  In Vanity Fair, the Second Circuit ruled that extraterritorial jurisdiction cannot be exercised over acts committed by a foreign national in his home country under a presumably valid trademark registration in that country.  Vanity Fair, 234 F.2d at 641-42. In Luft, 142 F.2d at 540, the Second Circuit held that it was inequitable to enjoin the defendant, a New York resident, from selling products in foreign countries in which it held a valid trademark.  Id.

Similarly, "[t]he Ninth Circuit has held that the existence of a conflict with a foreign trademark registration weighs against extraterritorial application of the Lanham Act." Aristocrat Techs., Inc. v. High Impact Design & Entertainment, 642 F. Supp. 2d 1228, 1236 (D. Nev. 2009) (citing Wells Fargo & Co. v. Wells Fargo Exp. & Co., 556 F.2d 406, 428-29 (9th Cir. 1977)).  In Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985), where both parties were California corporations, the court held that extraterritorial jurisdiction did not reach wholly foreign commerce in the Philippines, consisting of the defendant's purchases from Japan and sales in the Philippines, where the

defendant had a pending petition to cancel the plaintiff's Philippine registration of the trademarks at issue.[1]  Not only would application of the Lanham Act create a conflict with Philippine trademark law, but also the effect of the alleged illegal use of the trademark on United States commerce was insignificant compared to the effect on Philippine commerce with other nations.  Id.  The court distinguished Steele v. Bulova Watch Co., 344 U.S. 280, 289 (1952), where the plaintiff had succeeded in cancelling the defendant's Mexican trademark registration prior to the Court's decision, thereby avoiding a conflict with established foreign rights.

Here, too, the adjudication in this country of the Argentinean UBIQUITI NETWORKS and Ubiquiti logo trademarks could conflict with Argentina's trademark law and affect commerce in Argentina more than it would affect the commerce of the United States, where no Ubiquiti products are sold by Kozumi.

At least two district court cases in the Ninth Circuit have followed Star-Kist and found no extraterritorial jurisdiction under similar circumstances.

In Pinkberry, Inc. v. JEC Int'l Corp., 2011 WL 6101828, *1 (C.D. Cal.), the plaintiffs were California corporations, the corporate defendants were headquartered in California and Japan

---

[1] The court held that the Lanham Act did apply to infringing products sold within the United States or exported from the United States to the Philippines or any other country in which the defendant did not own the trademark.  Star-Kist, 769 F.2d at 1394.

and the individual defendants were citizens of Japan but resided in California.  The plaintiffs had a trademark registered in the United States and other countries and the defendants had an identical trademark registered in Japan.  Id.  There was a pending lawsuit filed by the plaintiffs in Japan to cancel the defendants' registration of the trademark.  Id.  Citing Star-Kist, the court found that there was no extraterritorial jurisdiction over the plaintiffs' trademark claims because a decision by a United States court "as to how the [ ] trademark may be used in Japan creates a serious potential for conflict with foreign law."  Id. at *5.

In Aristocrat v. High Impact Design, the court found that, because the defendant had a registered trademark in Venezuela, that country had the right to adjudicate the use of that trademark within its borders and, thus, there was a high potential for conflict if American authority were asserted to resolve the dispute over the Venezuelan trademark.  642 F. Supp. 2d at 1237.

Reebok, upon which Ubiquiti relies, is distinguishable because the plaintiff had a valid trademark in both the United States and Mexico and there did not appear to be trademark litigation in Mexico.  970 F.2d at 553.  Although Ubiquiti argues that it is the rightful owner of the Argentinean UBITQUITI NETWORKS and Ubiquiti logo trademarks, that is the issue the court in Argentina will decide.  Reebok is also distinguishable because the court relied upon the fact that the defendant organized and directed the manufacture of counterfeit shoes in Mexican border-

towns, knowing that many of the shoes would enter United States commerce.  Id. at 554-55.  Here, Kozumi is not selling Ubiquiti products in the United States nor are products sold in Argentina being shipped to or sold in the United States.  The fact that one of Kozumi's shipments from China to Argentina may have been routed through a port in Florida does not greatly affect United States commerce.

Argentina has the right to adjudicate how a trademark issued in that country is used in that country.  A ruling by this Court involving that trademark would likely create a conflict with Argentinean law.  However, the allegedly counterfeit products that Kozumi imports into Argentina may also display Ubiquiti's AIROS and other trademarks.  To the extent that the allegedly counterfeit products Kozumi is importing into Argentina display Ubiquiti's trademarks other than the UBIQUITI NETWORKS and Ubiquiti logo trademarks that are being litigated in Argentina, there is no conflict with Argentina law.

Furthermore, Ubiquiti presents evidence that Defendants are selling either counterfeit or infringing products in countries other than Argentina or planning to do so.  Notably, in Hsu's May 7, 2012 email, he refers to present and future distributors of Kozumi products in Middle East.  Defendants do not present evidence that they have a valid trademark or pending litigation in any country other than Argentina.  Thus, application of the Lanham Act to conduct in those countries would not create a conflict.

See Ocean Garden, Inc. v. Marktrade Co., Inc., 953 F.2d 500, 503 (9th Cir. 1991) (if there are no pending proceedings abroad, it would not be an affront to the foreign country's sovereignty to apply the Lanham Act); Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1130 (C.D. Cal. 1998) (accord).

Gallup, Inc. v. Business Research Bureau Ltd., 688 F. Supp. 2d 915 (N.D. Cal. 2010), is not to the contrary.  In Gallup, the court held that it could not apply the Lanham Act extraterritorially where a Pakistani citizen was using the Gallup trademark only in Pakistan, where the plaintiff had filed suit against the defendant in Pakistan and where the effect on American commerce was insignificant compared to the effect on Pakistani commerce.  Id. at 924-25.  Here, Defendants are residents of or incorporated in the United States and, even though none of their counterfeit products are sold in the United States, the effect of their infringement on Ubiquiti, which is located in the United States, appears to be significant.

Therefore, the conflict factor favors extraterritorial jurisdiction over acts occurring in Argentina involving any trademark other than the UBIQUITI NETWORKS and Ubiquiti logo marks and over acts involving infringement of all of Ubiquiti's marks occurring in any country other than Argentina.

B. Nationality of Parties and Locations of Corporations

Here, both Ubiquiti and Kozumi are incorporated and have their principal places of business in the United States and Hsu

and Kung are residents of the United States.  Therefore, this factor weighs in favor of extraterritorial jurisdiction.

C. Extent That Enforcement by Either State Can Be Expected to Achieve Compliance

In Reebok, the court held that, even where Mexico could enforce its own trademark laws, the United States had the superior ability to enforce its own and Mexico's trademark laws because the defendants had their principal place of business and the vast majority of their assets in the United States.  970 F.2d at 557. Similarly, here, Kozumi is incorporated in the United States, the individual Defendants are residents of the United States and it appears that they have significant assets in the United States. In Reebok, it was not clear whether an infringement suit was pending in Mexico.  Id. at 555-56.  And, it appears that Kozumi or Hsu has assets in Argentina because Ubiquiti has discovered that Hsu is the owner of, or affiliated with, several companies in Argentina.  Comp. ¶ 61.  This weighs in favor of leaving the litigation of the Argentinean trademark dispute to the Argentina courts.  However, it does not weigh against this Court's exercise of jurisdiction over Defendants' infringement in Argentina of other Ubiquiti trademarks, or infringement in other countries of any Ubiquiti trademark; Defendants own no other Ubiquiti-related trademark and Argentina is the only country in which there is pending litigation.

United States District Court
For the Northern District of California

D. Relative Significance of Effects on United States as
Compared to Other Countries

Ubiquiti has presented evidence of the significant economic
impact Defendants' alleged infringement activities in other
countries has had on Ubiquiti's finances and net worth in the
United States.  Defendants have submitted evidence that Argentina
implemented import restrictions in February, 2012 and that
Ubiquiti's lost sales result from these restrictions.  However,
Ubiquiti responds that its sales decline occurred in 2011, before
the trade restrictions were enacted.  Richie Dec. ¶¶ 5, 8.  There
is no evidence of the effect on other countries.  This factor
weighs in favor of exercising extraterritorial jurisdiction.

E. Explicit Purpose to Harm or Affect American Commerce

Ubiquiti submits evidence that Kozumi and Hsu had an explicit
purpose to harm or affect American commerce by harming Ubiquiti.
See McCollum Dec., Ex. I, May 7, 2012 Hsu email.  This factor
weighs in favor of exercising jurisdiction.

F. Foreseeability of Such Effect

A negative effect on Ubiquiti was foreseeable, as is
evidenced by Hsu's email.  This factor weighs in favor of
exercising jurisdiction.

G. Relative Importance to Violations Charged of Conduct in
the United States as Compared with Conduct Abroad

Ubiquiti is an American corporation and alleges that it has
been harmed in the United States, which is sufficient for this
factor to weigh in favor of exercising jurisdiction.  See Mattel,

**United States District Court**
For the Northern District of California

28 F. Supp. 2d at 1131 (that American corporation has been harmed sufficient to fulfill factor regarding relative importance of violations charged).

On balance, the seven factors relevant to the third prong for extraterritorial jurisdiction, together with the first two prongs which support extraterritorial jurisdiction, weigh in favor of finding jurisdiction to adjudicate the Lanham Act claims as to all infringing acts in countries other than Argentina and to infringing acts in Argentina regarding all trademarks other than the UBIQUITI NETWORKS and Ubiquiti logo marks that are subject to litigation pending in that country.

II. Personal Jurisdiction

   A. Legal Standard

   Specific jurisdiction is analyzed using a three-prong test: (1) the non-resident defendant must purposefully direct its activities or consummate some transaction with the forum or a resident thereof, or perform some act by which it purposefully avails itself of the privilege of conducting business in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987). Each of these conditions is required for asserting specific jurisdiction. Insurance Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1270 (9th Cir. 1981).

In intentional tort cases, the purposeful direction or availment requirement for specific jurisdiction is analyzed under the "effects" test."  Dole Foods Co., Inc. v. Watts., 303 F.3d 1104, 1111 (9th Cir. 2002).  The "effects test" requires that the defendant allegedly (1) committed an intentional act, 2) expressly aimed at the forum state, (3) causing harm that the defendant knew was likely to be suffered in the forum state.  Id.

If the first two prongs for specific jurisdiction have been met, the defendant has the burden of presenting a compelling case that the presence of some other considerations would render jurisdiction unreasonable.  Id.  Seven factors are considered in assessing whether the exercise of jurisdiction over a non-resident defendant is unreasonable: (1) the extent of the defendant's purposeful injection into the forum state's affairs, (2) the burden on the defendant, (3) conflicts of law between the forum state and the defendant's home jurisdiction, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the dispute, (6) the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.  Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 128 (9th Cir. 1995); Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991).

B. Analysis

    1. Effects Test--Intentional Act

    Citing <u>Panavision Int'l, LP v. Toeppen</u>, 141 F.3d 1316, 1322 (9th Cir. 1998), Ubiquiti argues that the fact that Defendants targeted Ubiquiti by attempting to register its trademark and attempting to extort millions of dollars from it satisfies the personal availment prong of the effects test for specific personal jurisdiction.

    <u>Panavision</u> addressed claims under the Federal Trademark Dilution Act and the California Anti-dilution statute, considered these to be akin to tort claims, and applied the effects test in analyzing specific jurisdiction.  141 F.3d at 1319, 1321.  The defendant purposefully registered Panavision's trademarks as his domain names on the Internet to force Panavision to pay him money. <u>Id.</u>  The court held that the brunt of the harm was felt in California, as the defendant knew it would be, because Panavision, although a Delaware corporation, had its principal place of business in California.  <u>Id.</u>  Therefore, under the effects test, the purposeful availment or direction requirement for personal jurisdiction was satisfied.  <u>Id.</u>

    Here, too, Kozumi and Hsu engaged in intentional acts which, though not undertaken in California, appear to have injured Ubiquiti which has its principal place of business here.  Thus, the purposeful availment requirement for specific jurisdiction is satisfied as to these Defendants.

With respect to Kung, Ubiquiti alleges that an Argentinean company, Tech Depot S.A., and other Argentinean companies are owned by or associated with Hsu, and are falsely identified by Defendants as distributors of Ubiquiti products.  Comp. ¶¶ 61b, 63.  An individual named Jung Hsin Peng is listed as the President of Tech Depot and Kung is listed as the "Director Alternative."  McCollum Dec., Ex. K., Tech Depot Corporate Records.  Ubiquiti also alleges that Kung is a shareholder of Netcom, another putative distributor of Ubiquiti products in Argentina.  Comp. ¶ 61d.  Finally, Ubiquiti alleges that, on June 20, 2011, Kung filed a trademark application with the United States PTO for the word, "UBIQUITI."  The email contact on the application was listed as "williamhsu@hotmail.com."  McCollum Dec., Ex. G.  The trademark application was deemed abandoned because a response was not received to the PTO finding that there was a likelihood of confusion between the "UBIQUITI" mark and two other previously registered trademarks.  Id.

Kung's filing a trademark registration application for the word "UBIQUITI" in the United States, allegedly knowing that the mark was identified and used by Ubiquiti, is an intentional act of purposeful direction sufficient to satisfy the first requirement for personal jurisdiction.

        2. Effects Test--Directed at the Forum

The second requirement for specific jurisdiction is that the claims arise out of the defendant's forum-related activities.  In

25

United States District Court
For the Northern District of California

other words, the court must determine if the plaintiff would not have been injured "but for" the defendant's conduct directed at it in the forum.  Id. at 1322.  The court in Panavision held that the defendant's registration of the plaintiff's trademarks as his own domain name had the effect of injuring the plaintiff in California.  Id.  The same holds true in this case where there is evidence that, but for Hsu's and Kozumi's actions, the injury to Ubiquiti would not have occurred.

The facts related to Kung--her trademark registration application, her alternative directorship in Tech Depot, and her ownership of shares in Netcom--provide evidence that she is a participant in the overall infringement scheme.  Therefore, this requirement is satisfied in regard to Kung.

C. Reasonableness Factors

1. Extent of Defendants' Purposeful Injection Into the Forum

There may be circumstances in which the level of purposeful injection into the forum is sufficient to support a finding of purposeful availment yet not enough to bolster the reasonableness of jurisdiction.  Dole Food, 303 F.3d at 1115.

Hsu argues that the exercise of personal jurisdiction over him in this forum would be unreasonable because he owns no property in California and, since moving to Florida, has been to California less than ten times, excluding the times when he was in a California airport on the way to another destination.  Hsu Dec.

United States District Court
For the Northern District of California

¶ 3.   However, Ubiquiti produces a December 26, 2011 email from Hsu to Pera, in which Hsu stated, "If you want to meet me or talk with me let me know as I am in Bay Area these days."  Jabbaz Dec., Ex. B.  Also, the distributorship contract between Kozumi and Ubiquiti and the email exchange between Hsu and Pera concerning the sale of the Argentinean UBITQUITI NETWORKS and Ubiquiti logo trademarks to Ubiquiti, represent Hsu and Kozumi's additional purposeful interjection into this forum.  Hsu's argument that, in his individual capacity, he never did any business with Ubiquiti and, therefore, only Kozumi should be subject to personal jurisdiction is undercut by the fact that Hsu purchased the UBIQUITI NETWORKS and Ubiquiti logo trademarks in Argentina in his own name and many of his emails to Pera are sent from him personally, not mentioning his role as an officer of Kozumi.

Therefore, this factor weighs in favor of the reasonableness of personal jurisdiction over Hsu and Kozumi.

Kung declares that she has no property in California, she has been to California less than ten times in the last ten years and never conducted business during any of those visits, she is a stay-at-home mother in Florida, and she has never engaged in any conversations, e-mail or other communications with Ubiquiti.  As indicated previously, the allegations about Kung are that, in 2011, she filed and abandoned a trademark application for the word "UBIQUITI," she is an alternative director of an Argentinean company that falsely advertises itself as a distributor of

Ubiquiti products and she is a shareholder in another Argentinean company that may be a distributor of counterfeit Ubiquiti products.  These allegations show only minimal purposeful injection by Kung into California and, thus, this factor does not support the reasonableness of jurisdiction over her.

> 2. Burden on Defendants

Kung declares that it would be a significant burden on her to litigate in California because she is the primary caretaker of her three young children.  She states that she has no alternative caretaker for her children so that, if she had to litigate here, she would have to bring her children with her and, because she provides for her family on a fixed income, flying with them from Florida to California would be financially burdensome.

Kung's declaration supports her argument that it would be a burden on her to defend herself in this forum and, therefore, this factor supports the unreasonableness of jurisdiction over her. Hsu and Kozumi do not address this factor.

> C. Other Factors

Defendants do not address the five other reasonableness factors.  Because it is Defendants' burden to present a compelling case that the exercise of jurisdiction would be unreasonable, the other five factors weigh in favor of exercising jurisdiction.

Even though Kung's activities meet the first two prongs of the effects test, because the first two reasonableness factors weigh strongly against jurisdiction over her, the Court determines

United States District Court
For the Northern District of California

that Ubiquiti is not likely to succeed in showing that Kung is subject to personal jurisdiction in this forum.  Therefore, a TRO will not issue against her absent a further showing by Ubiquiti.

Because all the factors, including the reasonableness factors, support jurisdiction over Hsu and Kozumi, the Court concludes that Ubiquiti is likely to succeed in showing that they are subject to personal jurisdiction in this forum.

III. TRO

Although Ubiquiti asserts thirteen causes of action in its complaint, only the three Lanham Act claims are at issue here. Ubiquiti does not seek a TRO for its copyright claims, nor could it because federal copyright law does not apply to extraterritorial acts of copyright infringement.  <u>Allarcom Pay Television, Ltd. v. General Instrument Corp.</u>, 69 F.3d 381, 387 (9th Cir. 1995).  The three claims under the Lanham Act are (1) counterfeiting under 15 U.S.C. § 1114, based upon Hsu and Kozumi's use of Ubiquiti's registered AIROS and AIRMAX trademarks; (2) infringement under 15 U.S.C. § 1114, based upon Hsu and Kozumi's infringement of Ubiquiti's registered AIROS and AIRMAX trademarks; and (3) false designation of origin under 15 U.S.C. § 1125(a) based upon Hsu and Kozumi's use of the UBIQUITI and UBIQUITI NETWORKS trademarks knowing that Ubiquiti had valid and protectable rights in these marks prior to Defendants' first use of them.

**United States District Court**
For the Northern District of California

A claim of trademark infringement may be brought against any person who, without the consent of the holder of the mark, uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive.  15 U.S.C. § 1114(1)(a); Century 21 Real Estate Corp. v. Sandin, 846 F.2d 1175, 1178 (9th Cir. 1988).  An infringing mark is one that is sufficiently similar to a registered mark to cause public confusion.  Montres Rolex, S.A. v. Snyder, 718 F.2d 524, 530 (2nd Cir. 1983).  A counterfeit mark is one which is identical to, or substantially indistinguishable from, a registered trademark.  15 U.S.C. § 1127.

To state a claim under 15 U.S.C. § 1125(a), the plaintiff must show that the defendant is using a mark confusingly similar to a valid, protectable trademark of the plaintiff's.  Brookfield Communs., Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 (9th Cir. 1999).  Whether a mark is registered or not, the first to use it is deemed the "senior" user and has the right to enjoin "junior" users from using confusingly similar marks in the same industry and market.  Id. at 1047.  The Lanham Act authorizes injunctive relief as a remedy for violations.  15 U.S.C. § 1116; Penpower Tech. Ltd. v. S.P.C. Tech., 627 F. Supp. 2d 1083, 1094 (N.D. Cal. 2008) (injunctive relief is remedy of choice for

United States District Court
For the Northern District of California

trademark cases, because there is no adequate remedy at law for the injury caused by a defendant's continuing infringement).

A. Ubiquiti's Valid, Protectable Trademarks

Ubiquiti owns federal registrations for the AIROS and AIRMAX trademarks and, therefore, is presumed to be the owner of these valid protectable trademarks.  See 15 U.S.C. § 1115(a) (certificate of registration evidence of validity of the mark and of registrant's exclusive right to use the mark).  Ubiquiti argues that, because it has been using the UBIQUITI, UBIQUITI NETWORKS and Ubiquiti Logo marks since at least 2005, it has common law rights in them that precede Hsu and Kozumi's counterfeiting and infringing activities in 2011.  As discussed previously, the ownership of the UBIQUITI NETWORKS and Ubiquiti logo trademarks in Argentina will be decided by the Argentina courts.  Otherwise, however, Ubiquiti's ownership and use of its marks precedes Hsu and Kozumi's use of the marks.  Therefore, except for the marks that are being litigated in Argentina, it is likely that Ubiquiti will succeed on the merits of proving it has valid, protectable trademarks.

B. Counterfeit Products Likely to Deceive the Public

Although the likelihood of confusion is usually a factual determination made by examining eight factors, in cases involving counterfeiting, it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently confusing.

<u>Phillip Morris USA Inc. v. Shalabi</u>, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004).

Ubiquiti has submitted the declarations of Michael Taylor, Ubiquiti Senior Software Engineer, and Gustavo Presman, an Engineering Computer Forensics Specialist, who compared actual Ubiquiti products with the allegedly counterfeit products Kozumi imported into Argentina. Each determined that the counterfeit product used design, hardware and software identical to the original Ubiquiti product. Notably, the counterfeit product used Ubiquiti's registered AIRMAX trademark, as well as Ubiquiti's name and corporate address. Moore Dec. ¶ 2(a). Also, when a user logs on to the counterfeit product, Ubiquiti's AirOs trademark comes up on the screen.

Moreover, Lin, Ubiquiti's employee who documented the counterfeit Ubiquiti products found at the Hoky factory at the time of the police raid, declares that he saw thousands of products labeled with the UBIQUITI, NANOSTATION and AirOS trademarks and submits photographs of some of these products. Lin Dec. ¶¶ 10-11. He also obtained shipping records showing that counterfeit Ubiquiti products were shipped to Kozumi. Lin Dec. ¶ 11, Ex. C.

Defendants argue that Ubiquiti has not proved counterfeiting because the declarations do not provide a chain of custody and the products compared by Taylor and Presman could have been original Ubiquiti products.

32

There is sufficient evidence to show that counterfeit products were produced by the Hoky factory in China and shipped to Kozumi for sale in South America or elsewhere and that some of these products were obtained in Argentina for testing by Ubiquiti's experts.  Furthermore, Defendants do not deny that they have purchased products from the Hoky factory; they merely claim that they have stopped doing so.

Therefore, based on the evidence submitted by Ubiquiti, it is likely to prevail on the issue of likelihood of confusion.

C. Immediate, Irreparable Injury

Defendants argue that a TRO is not warranted because Ubiquiti is not threatened with immediate, irreparable injury.  They point out that, since the beginning of 2012, they have not bought any allegedly counterfeit or infringing products from Hoky, or sold any, and they have not put any of their own ZoneWave products on the market because these products are still in the development stage.  Furthermore, they argue that they have a right to purchase Ubiquiti products from Ubiquiti distributors and to re-sell them.

Ubiquiti counters that emails from Hsu demonstrate that he and Kozumi are presently selling counterfeit products.

In his May 7, 2012 email, Hsu stated, "The only product that can beat Ubiquiti or make a dent o [sic] Ubiquiti's market share has to be a product that can be compatible with the Airmax TDMA . . . We are the only company that is selling a product that works the same as theirs."  Because Hsu states that he is not selling

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

any of his own ZoneWave products, the only product that he could be selling that "works the same" as Ubiquiti's are counterfeit Ubiquiti products.  Although Defendants claim that, in the past six months, they have only sold Ubiquiti products obtained from authorized distributors, they offer no proof of this.  Hsu attaches to his declaration two invoices showing that, in 2011, Kozumi purchased Ubiquiti products from authorized Ubiquiti distributors.[2]  Hsu Dec., Ex. 2.  However, Defendants do not produce invoices for purchases of Ubiquiti products in 2012 to demonstrate that they have continued to purchase Ubiquiti products from authorized distributors.  On the other hand, Ubiquiti submits invoices for Ubiquiti products shipped by Kozumi into Argentina at prices lower than expected, which show, according to Ubiquiti, that the products have not been purchased from an authorized distributor.

Although trademark infringement by products sold in Argentina with the UBIQUITI NETWORKS and Ubiquiti logo trademarks may not be within the subject matter jurisdiction of this Court, sale of products with the AirOS and AIRMAX trademarks are likely subject to this Court's jurisdiction.  Therefore, Kozumi and Hsu will be enjoined from selling counterfeit Ubiquiti products with these trademarks in Argentina and other countries.

_____

[2] Ubiquiti does not dispute that the sellers of these products are authorized Ubiquiti distributors.

Further, sale of the present version of the ZoneWave products can be enjoined under the Lanham Act because, when a user connects the ZoneWave product to a computer, Ubiquiti's software starts and displays Ubiquiti's AirOS trademark on the login screen.

Ubiquiti has adequately shown that it has been and is in imminent danger of being irreparably injured by Hsu and Kozumi's sale of counterfeit and infringing products in other countries. Ubiquiti does not have an adequate remedy at law because the sale of infringing or counterfeit products is likely to damage irreparably its reputation and goodwill and that of its distributors.  See Penpower Tech., 627 F. Supp. 2d at 1094.

D. Balance of Hardships

Defendants argue that the balance of hardships weighs in favor of denying a TRO because Ubiquiti seeks to shut down Kozumi's business by freezing its assets, and this will irreparably injure Kozumi and Hsu.  Hsu states that a large portion of Kozumi's business is totally unrelated to Ubiquiti products and, if its assets were frozen, it would be unable to purchase goods for resale or pay its bills.  Citing Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir. 1988), Ubiquiti responds that an injunction freezing Kozumi's assets is necessary so that it may obtain the equitable remedy of an accounting of Defendants' ill-gotten profits under 15 U.S.C.

United States District Court
For the Northern District of California

§ 1117.[3]  However, in <u>Marcos</u>, the evidence established that the defendants had transferred millions of dollars' worth of cash, negotiable instruments, jewelry and other property out of the Philippines to other countries, including the United States.  <u>Id.</u> at 1362-63.  Here, the significance of Ubiquiti's evidence submitted to show that Hsu cannot be trusted to preserve his and Kozumi's assets is questionable.  A dispute regarding the price of the Argentinean trademark does not indicate that Hsu or Kozumi will transfer assets out of the country to avoid paying a judgment.  Although Ubiquiti points to Hsu and Kung's divorce petition which lists as an asset only their residence, when public records show they own other real estate valued at $1.6 million. Defendants respond that the other properties are owned by a trust and are not marital assets under Florida law.  The Court agrees that freezing Defendants' assets would be too harsh a remedy and harmful to Defendants' business.

However, an order enjoining Hsu and Kozumi from selling counterfeit and infringing products will not harm them.  On the other hand, Ubiquiti has made a showing that Kozumi's sale of counterfeit and infringing products affects Ubiquiti's goodwill and reputation and undercuts its sales and the sales of its

---

    [3] Section 1117 provides that a prevailing plaintiff in an infringement action may recover the defendant's profits, damages and the costs of the action.

authorized distributors, all of which affect Ubiquiti's stock price and market capitalization.

Therefore, the Court finds that Ubiquiti has shown a likelihood of success on the merits of its Lanham Act claims and a significant threat of irreparable injury or, at least, that serious questions regarding the merits exist and the balance of the hardships tips sharply in Ubiquiti's favor. Therefore, the Court enjoins Hsu and Kozumi and their agents, officers, servants, employees, owners and representatives and all other persons, firms or corporations in active concert or participation with them from: (1) using in any manner any registered trademark owned by Ubiquiti, and the UBIQUITI, UBIQUITI NETWORKS, and Ubiquiti logo mark, or any name or mark that wholly incorporates or is confusingly similar to the aforementioned trademarks; (2) moving, destroying, or otherwise disposing of any items confusingly or deceptively similar to Ubiquiti's products and that bear any of the aforementioned trademarks that belong to Ubiquiti; (3) moving, destroying or otherwise disposing of any records or documents containing information related to the manufacturing, distributing, delivering, shipping, importing, exporting, marketing, promoting, selling or otherwise offering for sale of items that bear any of the aforementioned trademarks that belong to Ubiquiti; (4) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the above-mentioned activities. Excepted from this injunction is the selling,

manufacturing, distributing, delivering, shipping, importing, marketing and promoting of products in Argentina bearing the UBIQUITI NETWORKS or Ubiquiti logo trademark, which do not use any other Ubiquiti-owned trademark.  Also excepted from this injunction is the re-sale of genuine Ubiquiti products.

Rule 65(c) of the Federal Rules of Civil Procedure requires that a party must post a bond "in such sum as the court deems proper, for the payment of such costs or damage as may be incurred or suffered by any party found wrongfully enjoined or restrained." The Court finds that a bond in the amount of $10,000 is sufficient.  This restraining order will take effect, therefore, upon Ubiquiti's posting of a bond in the amount of $10,000.

CONCLUSION

For the foregoing reasons, the Court grants in part Ubiquiti's application for a TRO against Defendants Hsu and Kozumi, as described above.  It is ordered that Defendants Hsu and Kozumi show cause as to why a preliminary injunction should not issue on the same terms as the TRO.  A hearing on the Order to Show cause is set for Thursday, July 5, 2012 at 2 p.m.  Defendants may file an opposition brief, of no greater than ten pages, containing any facts or law that they were unable to include in their briefs to date, no later than June 25, 2012.  Ubiquiti may file a reply brief, no greater than five pages, addressing the new facts and law in Defendants' opposition brief, no later than June 28, 2012.

IT IS SO ORDERED.

Dated: 6/20/2012

CLAUDIA WILKEN
United States District Judge