IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UBIQUITI NETWORKS, INC.,                    No. C 12-2582 CW

      Plaintiff,                        ORDER GRANTING IN
                                            PART AND DENYING
    v.                                    IN PART MOTION TO
                                            DISMISS
KOZUMI USA CORP., et al.                    COUNTERCLAIMS
                                            (Docket No. 96)
      Defendants.
_____/

    Plaintiff Ubiquiti Networks, Inc. moves to dismiss the
counterclaims of Defendants Kozumi USA Corp. and Shao Wei Hsu
pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  Defendants
oppose the motion.  After considering all of the parties'
submissions and oral argument, the Court grants the motion in part
and denies it in part.

BACKGROUND

    Ubiquiti is a Delaware corporation with its principal place
of business in San Jose, California.  Docket No. 91, Counter-
Complaint (CC) ¶ 2.  The company designs, develops, and sells
various kinds of wireless communications devices, including
receivers, transmitters, routers, and antennas.  Id.  It typically
contracts with third-party distributors and resellers to market
and sell its products around the world.  Id.

    In May 2008, Ubiquiti entered into a Distribution Agreement
with Defendants Wu and Kozumi.  Id. ¶ 7.  Wu is the sole
shareholder and officer of Kozumi, a Florida corporation with its

---

[1] The individual Defendant named in Plaintiff's complaint as Shao
Wei Hsu indicates that his true name is William Hsu Wu.

United States District Court
For the Northern District of California

principal place of business in Miami. <u>Id.</u> ¶¶ 3-4. Under the terms of the parties' Distribution Agreement, Kozumi agreed to purchase certain Ubiquiti products in exchange for the right distribute them in "All Latin American countries." <u>Id.</u> ¶ 7; Declaration of Whitney McCollum, Ex. B, Distribution Agreement, at 7.[2] The Agreement would remain in effect for one year and would be automatically renewed every year thereafter, unless either party sought to terminate it. CC ¶ 8. In June 2009, shortly after the Agreement was renewed, Ubiquiti informed Kozumi that it was on track to become one of Ubiquiti's "master distributors," a title reserved for distributors who are able to meet a two million dollar annual sales quota. <u>Id.</u> ¶ 11.

Three months later, in November 2009, Ubiquiti contacted Kozumi to terminate the Distribution Agreement. <u>Id.</u> ¶ 12. When Kozumi sought an explanation for the termination, a Ubiquiti representative responded with an e-mail stating, "Hi William, Sorry, but we will not be proceeding further at this point. There has been a lot of pushback from existing distributors with pricing and some of the new product released by Kozumi." <u>Id.</u> ¶ 13. Kozumi alleges that the termination caused it "significant damages," including lost sales opportunities. <u>Id.</u> ¶ 15. In particular, Kozumi asserts that the termination "had negative ripple effects on Kozumi's reputation and ability to sell a range of other, non-[Ubiquiti] products." <u>Id.</u>

---

[2] Plaintiff asks the Court to take judicial notice of the Distribution Agreement. Docket No. 97. Because Defendants quote excerpts of this document in both their counter-complaint and their brief, Plaintiff's request for judicial notice is granted.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

After the termination, Kozumi continued to purchase Ubiquiti products through "official" distributors under contract with Ubiquiti and other "unofficial" resellers who were not under contract with Ubiquiti.  Id. ¶¶ 20-21.  Kozumi was ultimately able to purchase "thousands of units" in this manner, which it continued selling through its existing customer network in Latin America.  Id. ¶¶ 20-21, 31.  This network was concentrated in Argentina, where Kozumi made "virtually all of its [resales] of [Ubiquiti]'s products."  Id. ¶ 31.

Beginning in the middle of 2010, however, Ubiquiti began taking steps to prevent Kozumi from acquiring its products.  Id. ¶¶ 23-24.  Specifically, Kozumi and Wu allege that Ubiquiti coordinated a "boycott" among its various distributors and resellers to stop selling Ubiquiti products to Kozumi.  Id. ¶¶ 23-24, 27-28.  They further allege that Ubiquiti "coerce[d]" its distributors into participating in the boycott by threatening to terminate their distribution agreements or otherwise restrict their access to Ubiquiti products.  Id. ¶¶ 27-28.  As a result, several of the distributors and resellers that had previously sold Ubiquiti products to Kozumi ceased doing so.  Id. ¶¶ 25-26.

In May 2012, Ubiquiti filed this lawsuit against Kozumi and Wu for trademark infringement, counterfeiting, computer fraud, copyright infringement, unfair competition, false advertising, and libel.  Docket No. 1, Compl. ¶¶ 100-96; CC ¶ 42.  The suit alleges that Kozumi and Wu contracted a foreign manufacturer to produce counterfeit Ubiquiti products and then sold these counterfeit products in Latin America under Ubiquiti's trademarks.  Compl. ¶¶ 100-96.  Soon after filing its complaint, Ubiquiti learned that

United States District Court
For the Northern District of California

1   Wu was attempting to transfer assets out of the country and sought

2   a preliminary injunction to block the transfer.   The Court

3   solicited briefing and oral argument on the matter and, on July 5,

4   2012, issued a preliminary injunction freezing Wu's assets.

5   Docket No. 61.

6        One month later, in August 2012, Ubiquiti sent an e-mail to

7   all of its customers notifying them of the injunction against Wu.

8   McCollum Decl., Ex. A, Ubiquiti E-Mail.[3]  The e-mail, titled

9   "COUNTERFEIT UPDATE," featured Wu's picture and stated that he was

10  a counterfeiter who had used several different aliases and e-mail

11  addresses to purchase Ubiquiti products.   CC ¶¶ 43-44.   The e-mail

12  also detailed Ubiquiti's pending litigation efforts against Wu and

13  his associates outside the United States, specifically in

14  Argentina and China.   McCollum Decl., Ex. A, at 1.   In the right-

15  hand margin, below Wu's picture, the e-mail featured a small

16  heading that read "WARNING!"  Id.  The text beneath the heading

17  stated: "[W]e urge those who have worked with the counterfeiters

18  to come forward and let us know in exchange for amnesty no later

19  than August 20, 2012, after which we will be pursuing full-force

20  all of those who have been involved with the counterfeiters."  Id.

21       On September 27, 2012, the Court denied Wu and Kozumi's

22  motions to dismiss Ubiquiti's complaint and modify the preliminary

23  injunction.   Docket No. 85.   Ubiquiti then filed an amended

24  complaint the following week and Wu and Kozumi filed their answer

25

26

27       [3] Plaintiff asks the Court to take judicial notice of the August
    2012 e-mail.  Docket No. 97.  Because Defendants quote excerpts of this

28  document in both their counter-complaint and their brief, Plaintiff's
    request for judicial notice is granted.

and counter-complaint on October 29, 2012.  Ubiquiti moved to
dismiss the counter-complaint on November 19, 2012.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the
claim showing that the pleader is entitled to relief."  Fed. R.
Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to
state a claim, dismissal is appropriate only when the complaint
does not give the defendant fair notice of a legally cognizable
claim and the grounds on which it rests.  <u>Bell Atl. Corp. v.
Twombly</u>, 550 U.S. 544, 555 (2007).  In considering whether the
complaint is sufficient to state a claim, the court will take all
material allegations as true and construe them in the light most
favorable to the plaintiff.  <u>NL Indus., Inc. v. Kaplan</u>, 792 F.2d
896, 898 (9th Cir. 1986).  However, this principle is inapplicable
to legal conclusions; "threadbare recitals of the elements of a
cause of action, supported by mere conclusory statements," are not
taken as true.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)
(citing <u>Twombly</u>, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally
required to grant the plaintiff leave to amend, even if no request
to amend the pleading was made, unless amendment would be futile.
<u>Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.</u>, 911
F.2d 242, 246-47 (9th Cir. 1990).  In determining whether
amendment would be futile, the court examines whether the
complaint could be amended to cure the defect requiring dismissal
"without contradicting any of the allegations of [the] original
complaint."  <u>Reddy v. Litton Indus., Inc.</u>, 912 F.2d 291, 296 (9th
Cir. 1990).

United States District Court
For the Northern District of California

DISCUSSION

A.   Breach of Contract (First Counterclaim)

     To state a valid claim for breach of contract, the claimant must plead: (1) the existence of a contract; (2) the claimant's performance or excuse for nonperformance; (3) the opposing party's breach; and (4) damages to the claimant as a result of the breach. Armstrong Petrol. Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1391 n.6 (2004).

     Here, Defendants allege that Plaintiff breached the Distribution Agreement by terminating it without providing adequate notice or explanation.  Specifically, they assert that Plaintiff breached Section 6(a) of the Agreement, which provides,

> This agreement will be effective for one (1) year
> . . . . [and] will be automatically renewed from year to
> year thereafter unless terminated by either party with
> or without cause upon 30 days written termination notice
> transmitted to the other party prior to the end of the
> official term of this Agreement, or any renewal term.

McCollum Decl., Ex. B, at 3.  Plaintiff asserts that it terminated the contract pursuant to a different provision of the Agreement, namely, section 6(b).  That provision permits either party to terminate the contract if the other party "engages in deceptive or fraudulent business practices that could affect the aggrieved party's reputation or business."  Id.  Plaintiff contends that this provision allowed it to terminate the contract without giving Defendants an explanation or thirty days' notice because Defendants were "leveraging Ubiquiti's trademarks and goodwill" to market counterfeit Ubiquiti products.  Pl.'s Mot. 8.

     These assertions do not justify dismissal here.  Defendants expressly deny Plaintiff's accusations of counterfeiting and

United States District Court
For the Northern District of California

trademark infringement, see Answer ¶¶ 55, 57-58, and Plaintiff fails to provide any support for these charges beyond the allegations in its own complaint.  This is insufficient to support a Rule 12(b)(6) motion.  See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010) (stating that, on a motion to dismiss, courts generally may only consider the complaint and materials incorporated therein).

Plaintiff next argues that Defendants have failed to plead that they suffered damages as a result of the alleged breach. This assertion, however, is contradicted by Defendants' counter-complaint, which unequivocally states that Plaintiff's "sudden and unexplained termination of the Distribution Agreement caused Kozumi significant damages."  CC ¶ 15.  Defendants specifically allege that Plaintiff's alleged breach "had negative ripple effects on Kozumi's reputation and ability to sell a range of other [products]" and "caused Kozumi lost sales and [] opportunities."  Id.

Plaintiff contends that these allegations of damages conflict with a declaration submitted earlier by Defendant Wu.  In that declaration, Wu admits that Defendants were able to obtain Plaintiff's products through other channels after Plaintiff terminated the Distribution Agreement.  See Docket No. 24, Wu Decl. ¶ 11.  But Wu never states that Plaintiff's termination of the Agreement did not harm Defendants.  The mere fact that Defendants were able to obtain Plaintiff's products from other sources after Plaintiff terminated the Agreement does not mean that Defendants did not incur added expenses or suffer other damages in doing so.  Wu's declaration, in short, is not

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   inconsistent with the allegations in Defendants' counter-

2   complaint.

3       Thus, because Defendants have plead every element of a breach

4   of contract claim, Plaintiff's motion to dismiss is denied with

5   respect to Defendants' first cause of action.

6   B.   Breach of the Implied Covenant of Good Faith and Fair Dealing
         (Second Counterclaim)
7
8       Under California law, "[t]here is an implied covenant of good

    faith and fair dealing in every contract that neither party will
9
    do anything which will injure the right of the other to receive
10
    the benefits of the agreement." Comunale v. Traders & Gen. Ins.
11
12  Co., 50 Cal. 2d 654, 658 (1958).  To state a claim for breach of

13  the implied covenant, the claimant must allege "that the conduct

14  of the [opposing party], whether or not it also constitutes a

    breach of a consensual contract term, demonstrates a failure or
15
    refusal to discharge contractual responsibilities, prompted not by
16
    an honest mistake, bad judgment or negligence but rather by a
17
    conscious and deliberate act." Careau & Co. v. Security Pac.
18
    Business Credit, Inc., 222 Cal. App. 3d 1371, 1395 (1990).
19
20      Here, Defendants allege that Plaintiff breached the implied

21  covenant of good faith and fair dealing by failing to give them

    sufficient notice prior to terminating the Distribution Agreement.
22
    They further allege that Plaintiff failed to provide an adequate
23
    explanation for the termination and an opportunity to cure any
24
    alleged breach on their part.  Plaintiff contends that these
25
26  allegations merely restate Defendants' breach of contract

27  allegations and, thus, are superfluous.

28

**United States District Court**
For the Northern District of California

California courts have made clear that a claimant must allege more than a simple breach of contract to state a valid claim for breach of the covenant of good faith and fair dealing. See <u>Guz v. Bechtel Nat'l Corp.</u>, 24 Cal. 4th 317, 352 (2000). "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." <u>Careau</u>, 222 Cal. App. 3d at 1395; see also <u>Zody v. Microsoft Corp.</u>, 2012 WL 1747844, at *4 (N.D. Cal.) ("'[I]nsofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely re-alleges that breach as a violation of the covenant is superfluous.'" (quoting <u>Guz</u>, 24 Cal. 4th at 352)).

Defendants have failed to satisfy this standard. Their counterclaim for breach of the implied covenant does not allege any conduct beyond that which their breach of contract claim alleges. Although Defendants contend in their opposition brief that Plaintiff acted in bad faith -- in particular, that Plaintiff fabricated its reasons for terminating the Agreement -- they omit this allegation from their counter-complaint. Even if Defendants had included the allegation in the counter-complaint, their claim would still likely fall short. Defendants' only basis for alleging bad faith here is that Plaintiff's current explanation for the termination differs slightly from the explanation it provided to Defendants in 2009. This deviation, however, does not evince bad faith. Defendants' own counter-complaint asserts that Plaintiff's 2009 e-mail explaining its termination decision was

both "cryptic" and incomplete.  CC ¶ 13.  The fact that the e-mail differs slightly from the formal allegations Plaintiff now asserts in this lawsuit does not support a showing of bad faith.

Accordingly, Defendants' counterclaim for breach of the implied covenant of good faith and fair dealing is dismissed. Defendants are granted leave to amend to allege conduct by Plaintiff, beyond its alleged breach of the Distribution Agreement, that constitutes bad faith.

C.   Sherman Antitrust Act Violations (Third Counterclaim)

To state a claim under section 1 of the Sherman Act, 15 U.S.C. § 1, a claimant "must demonstrate: '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (quoting Hairston v. Pac. 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)).

Here, Defendants allege that Plaintiff violated section 1 of the Sherman Act by asking its distributors and resellers not to sell Plaintiff's products to Defendants.  Plaintiff contends that this counterclaim is barred by the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a.  It also contends that Defendants have failed to allege a cognizable antitrust injury. This section addresses each argument in turn.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1.    FTAIA Jurisdictional Bar[4]

The FTAIA, enacted in 1982, establishes a general rule that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations" unless the conduct has an effect on domestic commerce. 15 U.S.C. § 6a; In re DRAM Antitrust Litig., 546 F.3d 981, 985 (9th Cir. 2008).  Congress enacted the FTAIA because it believed that American courts' jurisdiction over international commerce should be limited to transactions that affect the American economy.  See Hartford Fire Ins. v. California, 509 U.S. 764, 796 n.23 (1993) (citing H.R. Rep. No. 97–686, ¶¶ 2–3, 9–10 (1982)). The FTAIA provides that all trade with foreign nations is exempt from the Sherman Act unless

> (1)   such conduct has a direct, substantial, and reasonably foreseeable effect --
>     (A)   on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>     (B)   on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> (2)   such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.  Thus, the FTAIA creates a two-part test asking whether the alleged antitrust conduct "(1) has a 'direct,

---

[4] Plaintiff asserts that, although its motion arises under Rule 12(b)(6), dismissal under the FTAIA "would be equally appropriate under Rule 12(b)(1) [for lack of subject matter jurisdiction]."  Pl.'s Mot. 11 n.4.  Defendants, however, contend that the "FTAIA does not implicate the Court's subject matter jurisdiction."  Opp. 7 n.3 (emphasis in original).  The Court addressed this issue -- which is relegated to footnotes in the parties' briefs -- in In re Static Random Access Memory (SRAM) Antitrust Litig., 2010 WL 5477313, at *2-*3 (N.D. Cal.) (concluding that "courts in this district continue to apply the [FTAIA] statute as jurisdictional").

substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" In re DRAM Antitrust Litig., 546 F.3d at 985 (quoting F. Hoffmann−La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 159 (2004)).

Ninth Circuit case law interpreting the FTAIA makes clear that Defendants' Sherman Act claims are barred here. McGlinchy v. Shell Chemical Co., 845 F.2d 802 (9th Cir. 1988), is particularly instructive. There, the plaintiffs asserted claims under sections 1 and 2 of the Sherman Act against a chemical producer after the chemical producer terminated their rights to distribute its products abroad. Id. at 805-06. Previously, the plaintiffs enjoyed the exclusive right to distribute the defendant's products in Southeast Asia, South America, Africa, and the Middle East. Id. After reviewing the geographic scope of the parties' distribution agreements, the Ninth Circuit held that the FTAIA barred the plaintiffs' antitrust claims because they "relate[d] only to foreign commerce without the requisite domestic anticompetitive effect." Id. at 815.

The court reasoned that "section 6a 'was intended to exempt from United States antitrust law conduct that lacks the requisite domestic effect, even where such conduct originates in the United States or involves American-owned entities operating abroad.'" Id. at 814 (quoting Eurim-Pharm GmbH v. Pfizer, Inc., 593 F. Supp. 1102, 1106 (S.D.N.Y. 1984)). The court then highlighted the fact that the parties' distribution agreement only pertained to product distribution abroad and, thus, only "involve[d] trade or commerce

United States District Court
For the Northern District of California

1  (other than import trade or import commerce) with foreign

2  nations."  845 F.2d at 815 (quoting 15 U.S.C. § 6a).

3       Just like the plaintiffs in McGlinchy, Defendants in the

4  present case have "failed to allege that [Plaintiff's] conduct

5  has a 'direct, substantial, and reasonably foreseeable effect' on

6  domestic commerce."  Id.  Rather, Defendants' allegations focus on

7  the impact of Plaintiff's conduct on a foreign market.  Their

8  counter-complaint expressly states that "the relevant geographic

9  market is Argentina, as virtually all of Kozumi's resells of UBNT

10 products were sent to Argentina."  CC ¶ 31.

11      Although Defendants allege that Plaintiff also engaged in

12 anticompetitive conduct within the United States by asking its

13 distributors and re-sellers not to offer its products to

14 Defendants, id., this allegation is insufficient to overcome the

15 FTAIA bar.  As McGlinchy illustrates, to avoid FTAIA dismissal,

16 the alleged conduct must have had an impact on competition in the

17 United States -- in short, the "requisite domestic effect."  845

18 F.2d at 814 (noting that domestic conduct alone is insufficient).

19 Defendants' assertion that they were injured in Florida, where

20 they reside, is too narrow to satisfy this requirement and does

21 not implicate the broader concerns about market competition that

22 the Sherman Act targets.  Id.; see also Ralph C. Wilson Indus. v.

23 Chronicle Broadcasting Co., 794 F.2d 1359, 1363 (9th Cir. 1986)

24 ("We have held that 'it is injury to the market, not to individual

25 firms, that is significant.'" (citations omitted)).

26      Defendants fail to address McGlinchy in their brief and rely

27 instead on two cases from other jurisdictions to argue that the

28 FTAIA does not apply in the present case: Carpet Grp. Int'l v.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Oriental Rug Importers Ass'n, 227 F.3d 62 (3d Cir. 2000), and In re Air Cargo Shipping Servs. Antitrust Litig., 2008 WL 5958061 (E.D.N.Y.).  These cases are inapposite, however, as they both involved conduct affecting "import trade or import commerce," which the FTAIA specifically recognizes is subject to the Sherman Act.  See 15 U.S.C. § 6a (stating that sections 1 through 7 of the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations" (emphasis added)).  Defendants here do not allege that they were importing Ubiquiti products into the United States.  In fact, Defendant Wu has specifically asserted that Kozumi shipped its Ubiquiti products only into Argentina.  Docket No. 40-1, Declaration of William Hsu Wu ¶¶ 11-12 ("Between November 2009 and December 2011, Kozumi purchased thousands of [Ubiquiti] products through Ubiquiti distributors and resellers, nearly 100% of which were imported into Argentina.").  Although Defendants claimed at oral argument that they shipped other, non-Ubiquiti products into the United States, they never plead that Plaintiff prevented them from importing those other products into the United States.  Accordingly, Defendants cannot escape the FTAIA's jurisdictional bar here.

> 2.   Cognizable Antitrust Injury

Even if Defendants' claims were not subject to dismissal under the FTAIA, they would still fail for a more fundamental reason: namely, failure to allege a cognizable injury under the Sherman Act.  The Ninth Circuit has repeatedly recognized that an "alleged violation must cause injury to competition beyond the impact on the claimant under section 1" of the Act.  McGlinchy,

845 F.2d at 811; see also Fine v. Barry & Enright Prods., 731 F.2d 1394, 1399 (9th Cir. 1984) ("Plaintiff must show injury to a market or to competition in general, not merely injury to individuals.").

As noted above, Defendants have not alleged an injury to competition in the relevant market here.  Their counter-complaint identifies the "market for wireless networking equipment" in Argentina as the relevant market but fails to explain how Plaintiff's conduct has undermined competition in that market. See CC ¶¶ 30-31.[5]  Rather, the counter-complaint focuses on injuries to Defendants themselves, asserting that "the impact of UBNT's boycott was felt primarily or exclusively at Kozumi's principal place of business in Miami, Florida." CC ¶ 31 (emphasis added); see also id. ("Kozumi has been injured by the boycott." (emphasis added)).  Although Defendants suggest that other distributors and resellers are also harmed by Plaintiff's conduct, id. (alleging that "distributors and resellers who desire to sell to Kozumi are barred from doing so"), Defendants never allege that these distributors and resellers are participants in the Argentinian market for wireless networking products.  Moreover, their counter-complaint does not say that Plaintiff asked these distributors and resellers to stop selling any wireless networking products to Defendants; it merely alleges that Plaintiff asked

---

[5] The McGlinchy court emphasized the importance of alleging an injury in the "relevant market."  See 845 F.2d at 812 ("Appellants . . . specifically identify the relevant market by alleging: 'For the purposes of the antitrust claims alleged herein, PB [a chemical product] is the relevant market for determining the anti-competitive effects of the defendant's actions.'  Nowhere in their AFA complaint, however, do appellants allege injury to the competitive market for PB.").

United States District Court
For the Northern District of California

them to stop selling its own products to Defendants.  Because it is not clear how this narrow request would disrupt the broader market for wireless networking products -- especially when Defendants themselves concede that "[t]here are many manufacturers of wireless networking equipment," CC ¶ 30 -- this allegation is insufficient to state a claim.

The limited nature of Plaintiff's request -- focusing only on sales of its own products -- distinguishes this case from Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), which Defendants cite for support.  In Klor's, the Supreme Court held that an agreement among several national distributors not to do business with an individual appliance store violated the Sherman Act because it deprived the store of "its freedom to buy appliances in an open competitive market."  Id. at 213.  The defendants there agreed not to sell any appliances to the individual store or to sell to it "only at discriminatory prices." Id. at 209-10.  Here, in contrast, Defendants do not allege that Plaintiff sought to prevent them from acquiring any wireless networking products.  As noted above, they only allege that Plaintiff sought to prevent them from acquiring Plaintiff's own products -- a much narrower restraint of trade than in Klor's.

Defendants also fail to allege that Plaintiff's conduct was designed to achieve some specific anticompetitive purpose.  In Klor's, the express purpose of the defendants' boycott was to benefit one of the plaintiff's competitors.  Id.  This is why the Klor's Court was willing to "infer[] injury to the competitive process itself from the nature of the boycott agreement," even though the plaintiff's store was the only firm harmed by the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

agreement.  <u>NYNEX Corp. v. Discon, Inc.</u>, 525 U.S. 128, 134 (1998).
But here, Defendants have not alleged that Plaintiff organized the
alleged boycott to benefit one of Kozumi's competitors or even to
expand its own market share.  This distinguishes the present case
from <u>Klor's</u> and demonstrates why it provides little support to
Defendants.  <u>Cf.</u> <u>Rutman Wine Co. v. E. & J. Gallo Winery</u>, 829 F.2d
729, 733-34 (9th Cir. 1987) (affirming dismissal of Sherman Act
claims because the plaintiff wine distributor failed to allege
sufficient harm to competition under <u>Klor's</u> despite alleging that
the defendant wine manufacturer organized a group boycott of
plaintiff).

Defendants' reliance on <u>Z Channel Ltd. P'ship v. Home Box
Office, Inc.</u>, 931 F.2d 1338 (9th Cir. 1991), is similarly
misplaced.  Defendants cite <u>Z Channel</u> for the proposition that an
"agreement to exclude the plaintiff from the relevant market via
an economic boycott of necessary input units constitutes antitrust
injury."  Opp. 16 (citing 931 F.2d at 1347).  This principle,
however, has little application in the present case where, as
noted above, Defendants have failed to explain how Plaintiff's
alleged conduct affected the relevant market or accomplished some
anticompetitive purpose.

Although Defendants may be able to amend their Sherman Act
counterclaim to explain how Plaintiff's conduct undermined
competition in the relevant market -- namely, Argentina -- doing
so would be futile here.  As explained above, claims alleging harm
to competition only in foreign markets are barred by the FTAIA.
Accordingly, Defendants' Sherman Act counterclaim is dismissed
with prejudice.

**United States District Court**
For the Northern District of California

D.   Cartwright Act Violations (Fourth Counterclaim)

Defendants' Cartwright Act counterclaim relies on the same allegations as its Sherman Act counterclaim.  See CC ¶¶ 33-35. California courts have long recognized that a claimant's failure to state a Sherman Act claim will likewise condemn its claims under the Cartwright Act.  See generally Marin Cnty. Bd. of Realtors, Inc. v. Palsson, 16 Cal. 3d 920 (1976) ("A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law.  Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.").  Once again, McGlinchy offers guidance:

> [A]ppellants base their state law claim on the same
> facts on which they base their Sherman Act claims.  We
> have recognized that Cartwright Act claims raise
> basically the same issues as do Sherman Act claims.
> California state courts follow federal cases in deciding
> claims under the Cartwright Act.  As a result, our
> conclusion with regard to the Sherman Act claims applies
> with equal force to appellants' Cartwright Act claims.
> Accordingly, we also affirm the district court's grant
> of judgment on the pleadings on the state antitrust
> claims.

845 F.2d at 811 n.4 (citations omitted); see also Korea Kumho Petrochemical v. Flexsys America LP, 2008 WL 686834, at *9 (N.D. Cal.) ("Plaintiff's failure to plead a cognizable Sherman Act claim requires dismissal of the fourth cause of action under California's Cartwright Act as well.").

Here, Defendants' Cartwright Act counterclaims suffer from the same shortcomings as their Sherman Act counterclaims. Specifically, Defendants' failure to explain how Plaintiff's conduct undermined competition in domestic markets means that they have similarly failed to explain how Plaintiff's conduct

United States District Court
For the Northern District of California

undermined competition in a California market.  See RLH Indus., Inc. v. SBC Communications, Inc., 133 Cal. App. 4th 1277, 1281 (2005) (recognizing that the Cartwright Act is meant to protect against "anticompetitive conduct that causes injury in California").[6]  Accordingly, Defendants' Cartwright Act counterclaim, like their Sherman Act counterclaim, is dismissed with prejudice.

E.   Defamation (Sixth Counterclaim)

Defendants assert a counterclaim for defamation based on Plaintiff's August 2012 e-mail to its customers characterizing Defendants as counterfeiters.  Plaintiff contends that this claim is barred because its e-mail is protected by California's litigation privilege and by the Noerr-Pennington doctrine.

1.   Litigation Privilege

Under California Civil Code section 47(b), communications made in or related to judicial proceedings cannot give rise to tort liability.  The purpose of the privilege is "to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." Silberg v. Anderson, 50 Cal. 3d 205, 213 (1990).

The litigation privilege applies to communications (1) made during a judicial proceeding; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; (4) that have some connection or logical relation to

---

[6] Defendants' suggestion that Plaintiff's California-based resellers and distributors are harmed by Plaintiff's conduct is unpersuasive for the reasons articulated in the Sherman Act discussion: Defendants have failed to allege that these firms are competing in the relevant market.

the action.  Id. at 212; Premier Communications Network, Inc. v. Fuentes, 880 F.2d 1096, 1102 (9th Cir. 1987).  Once these requirements are met, section 47(b) operates as an absolute privilege.  Silberg, 50 Cal. 3d at 216.

The privilege is quite broad.  It covers "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved."  Id.  Courts have applied the litigation privilege to all tort claims, with the exception of malicious prosecution.  Edwards v. Centex, 53 Cal. App. 4th 15, 29 (1997).  "Any doubt about whether the privilege applies is resolved in favor of applying it."  Kashian v. Harriman, 98 Cal. App. 4th 892, 913 (2002).

Defendants contend that the privilege does not apply here because Plaintiff's e-mail was sent to non-parties who lacked a substantial interest in the outcome of the litigation.  For support, they cite broad language from Silberg stating that "republications to nonparticipants in the action are generally not privileged under section 47."  50 Cal. 3d at 219.  They also point to this Court's decision in Sharper Image Corp. v. 4 Target Corp., which required the party asserting the privilege to show that it directed its communication at recipients with a "substantial interest" in the outcome of the underlying litigation.  425 F. Supp. 2d 1056, 1079 (N.D. Cal. 2006).  Defendants argue that, under these cases, Plaintiff's e-mail is not privileged because its recipients had no connection to Wu or Kozumi and, thus, lacked a substantial connection to this case.

**United States District Court**
For the Northern District of California

A more complete reading of <u>Sharper Image</u> demonstrates why Defendants' argument fails.  In <u>Sharper Image</u>, the defendants asserted a counterclaim against the plaintiff for tortious interference with economic advantage based on an e-mail that the plaintiff had sent to certain retailers and media outlets.  <u>Id.</u> at 1060.  The e-mail asked them not to carry the defendants' products or advertisements and noted that the plaintiff had sued the defendants for patent and trademark infringement.  <u>Id.</u> at 1075-76.  This Court found that the e-mail was protected by the litigation privilege because "the retailer and media recipients possessed a substantial interest in the underlying dispute."  <u>Id.</u> at 1079.  The Court reasoned that, if the plaintiff ultimately prevailed, the outcome could "significantly disrupt[] the recipients' business arrangements."  <u>Id.</u>  The outcome could also "significantly increase[] the legal liability of the letter recipients."  <u>Id.</u>  Because of these potential consequences, the Court held that the e-mail was privileged under section 47 and the defendants' counterclaim was barred.  <u>Id.</u>

Defendants argue that <u>Sharper Image</u> is inapposite because the e-mail recipients in that case, unlike in this one, all had existing business relationships with the defendants.  Although the Court found those business relationships relevant in <u>Sharper Image</u>, it did so only because they illustrated the limited reach of the plaintiff's e-mails.  As the Court noted, the messages "were not broadcast to the entire media through a press release, or to the public generally, but to specific media representatives who carried advertisements for the [defendant]."  <u>Id.</u>  Plaintiff's e-mail in the present case was similarly limited in its reach,

United States District Court
For the Northern District of California

even if it was not directed specifically at Defendants' business associates.  Indeed, Plaintiff's e-mail was not sent to "the entire media" nor to "the public generally" but, rather, to its own customer base -- the very group that Defendants were likely to contact to acquire Plaintiff's products after Plaintiff terminated the Distribution Agreement.  Just as in Sharper Image, this group had a "substantial interest" in the outcome of Plaintiff's lawsuit because the litigation implicated their business prospects and, potentially, their legal liability.

More recently, in Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC, a Southern District of California court dismissed a counterclaim for tortious interference based on similar logic.  814 F. Supp. 2d 1033, 1040-41 (S.D. Cal. 2011).  There, the plaintiff issued a press release on its website describing its pending lawsuit against the defendant for patent infringement and warning other "[c]ontractors and dealers" of the potential risks of doing business with the defendant.  Id. at 1037.  The plaintiff then sent the press release to "several thousand recipients, including its customers, vendors, and to trade publications . . . that had not advertised any [of the defendant's] product[s]."  Id.  Nevertheless, the court still found that

> those who received the Press Release have a substantial interest in the outcome of this litigation.  For those that bought or have considered buying the [products] at issue, they are potentially subject to infringement liability.  And those considering business with [the defendant] would want to know what of [the defendant]'s products may be subject to infringement liability.

Id. at 1041.  In short, the Weiland court applied the litigation privilege even more broadly than this Court did in Sharper Image

by extending it to communications with entities who had never previously done business with the defendant.  Thus, under both Weiland and Sharper Image, the August 2012 e-mail falls squarely within the scope of section 47's privilege.  Accordingly, Defendants' defamation claim based on the contents of that e-mail must be dismissed.  Defendants are granted leave to amend but only if they can plead a counterclaim based on communications that are not protected by the litigation privilege.

> 2.   Noerr-Pennington Doctrine

Because Plaintiff's e-mail is subject to California's litigation privilege, the Court need not address whether it is also protected by the Noerr-Pennington doctrine, Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).

F.   Intentional Interference with Prospective Economic Advantage (Fifth Counterclaim)

Defendants allege that Plaintiff tortiously deprived them of prospective economic advantage by intentionally undermining their relationships with certain of Plaintiff's resellers and distributors.

To state a valid claim for intentional interference with prospective economic advantage, a claimant must show (1) an economic relationship with a third party containing the probability of future economic benefit for the claimant; (2) the opposing party's knowledge of this relationship; (3) intentional acts by the opposing party designed to disrupt the relationship; (4) actual disruption of the relationship; (5) damages proximately caused by the opposing party's acts; and (6) that those acts were

23

wrongful by some legal measure other than the fact of the
interference itself.  Korea Supply Co. v. Lockheed Martin Corp.,
29 Cal. 4th 1134, 1153-54 (2003).

     "California law has long recognized that the core of
intentional interference business torts is interference with an
economic relationship by a third-party stranger to that
relationship, so that an entity with a direct interest or
involvement in that relationship is not usually liable for harm
caused by pursuit of its interests."  Marin Tug & Barge, Inc. v.
Westport Petroleum, Inc., 271 F.3d 825, 832 (9th Cir. 2001).  See
also ViChip Corp. v. Lee, 438 F. Supp. 2d 1087, 1097 (N.D. Cal.
2006) ("[T]he core of intentional interference business torts is
interference with an economic relationship by a third-party
stranger to that relationship.").

     Defendants have failed to state a claim for intentional
interference with prospective economic advantage for several
reasons.  First, Defendants' pleading recognizes that Plaintiff
had prior relationships with the third-party entities it contacted
here.  Indeed, Defendants expressly refer to these entities in
their counter-complaint as "UBNT distributors and resellers of
UBNT products."  CC ¶ 37 (emphasis added).  Thus, Plaintiff had an
interest in Defendants' relationship with these distributors and
resellers and was not a stranger to them.

     Second, Defendants have not identified any "independently
wrongful" conduct by Plaintiff here.  Korea Supply, 29 Cal. 4th at
1159 ("We conclude . . . that an act is independently wrongful if
it is unlawful, that is, if it is proscribed by some
constitutional, statutory, regulatory, common law, or other

**United States District Court**
For the Northern District of California

1   determinable legal standard.").  Although Defendants assert other

2   tort claims against Plaintiff based on the same conduct, none of

3   those other claims survive this motion.

4        Third and finally, Plaintiff has shown that its e-mails to

5   distributors and resellers -- the communications on which

6   Defendants' intentional interference counterclaim is based -- are

7   protected by California's litigation privilege.  See above Section

8   E.1.  Thus, even if Defendants had stated a valid counterclaim for

9   intentional interference with prospective economic advantage,

10  Plaintiff would be immune because of the litigation privilege.

11       This counterclaim is therefore dismissed.  Defendants are

12  granted leave to amend if they can remedy the deficiencies noted

13  above and plead some other "independently wrongful" conduct by

14  Plaintiff that is not protected by the litigation privilege.

15  G.   UCL Violations (Seventh Counterclaim)

16       Defendants' UCL counterclaim arises entirely from their tort

17  and antitrust counterclaims.  CC ¶ 52 (stating that the UCL claim

18  is based on "violations of law as described in Counts II through V

19  above.").  Because all of those claims fail, so, too, does their

20  UCL claim.  Cf. Digital Sun v. The Toro Co., 2011 WL 1044502, at

21  *5 (N.D. Cal.) ("[Plaintiff]'s third cause of action under [the

22  UCL] is based solely upon a violation of § 2 of the Sherman Act.

23  Because the Sherman Act violation is insufficiently pled, it

24  follows that [the plaintiff] has also failed to plead any

25  violation of the Unfair Competition Law.").

26                              CONCLUSION

27       For the reasons set forth above, the Court GRANTS IN PART and

28  DENIES IN PART Plaintiff's motion to dismiss Defendants'

counterclaims (Docket No. 96).  Defendants' third and fourth
counterclaims are dismissed with prejudice; their second, fifth,
sixth, and seventh counterclaims are dismissed with leave to amend
as outlined above.  Defendants may file an amended counter-
complaint within twenty-one days of this order.

IT IS SO ORDERED.


Dated: 1/29/2013

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California